**Diane S. HABJAN, Now Diane S. Knight, Appellee**

v.

**John HABJAN, Appellant.**

Superior Court of Pennsylvania.

Submitted May 13, 2013.

Filed July 25, 2013.

Cassandra M. Neely, Clarion, for appellant.

Heidi U. Dennison, Brookville, for appellee.

BEFORE: BENDER, J., LAZARUS, J., and STRASSBURGER, J.*

OPINION BY BENDER, J.

John Habjan (Husband) appeals from the order entered November 8, 2011, that granted the petition for contempt/enforcement of a Marital Settlement Agreement (MSA or Agreement) filed by Diane S.

---

* Retired Senior Judge assigned to the Superior Court.

Habjan, now Diane S. Knight (Wife), and granted in part and denied in part the petition for contempt/special relief filed by Husband. After review, we affirm.

Husband and Wife were married in August of 1988, and separated in August of 2007. Wife filed a complaint in divorce in September of 2007. Extensive negotiations ensued with both parties filing numerous petitions relating to the economics of the marital estate, the main asset of which was Monroe Heights Development Corporation, Inc. (the Corporation or MHD). On September 26, 2008, the parties entered into a MSA and the divorce decree was granted on October 7, 2008. Despite the finalization of the divorce, the parties continued to file petitions for contempt, special relief, and enforcement of the MSA, including the petitions that underlie the order presently on appeal.

We begin by quoting in its entirety the November 8, 2011 order issued by the trial court in response to the parties' petitions:

1. [Wife's] Petition for Contempt of a Court Order and Enforcement of Marital Settlement Agreement is **GRANTED.** Accordingly,

 a. [Husband] is found to be **in contempt** of the Court's August 17, 2009, order for filing *Monroe Heights Development Corporation, Inc. v. Diane S. Habjan* in the Clarion County Court of Common Pleas.

 b. If [Husband] does not discontinue that lawsuit *with prejudice* by **December 31, 2011,** with proof given to this Court, he shall report to the Jefferson County jail on **January 1, 2012,** at 7:00 p.m., and shall remain incarcerated until such time as the Court receives verification that the Clarion County lawsuit has been discontinued.

 c. [Husband's] claims for past due interest on a public credit loan, unpaid payroll taxes, and unpaid workers' compensation taxes have expired.

 d. [Husband] shall, within **THIRTY (30) DAYS,** issue a check or money order, payable to Heidi Ulrich Dennison, Esquire, [Wife's attorney] in the amount of $10,690.62, to be appropriately distributed between her and [Wife's] Clarion County counsel.

2. [Husband's] Petition for Contempt and Petition for Special Relief is **GRANTED in part and DENIED in part** as more fully articulated in the accompanying opinion. Accordingly,

 a. [Wife] is found to be **in contempt** of the Court's August 17, 2009, order for maligning [Husband] in e-mails to William Braatz and for harassing, disturbing, and interfering with [Husband] and Monroe Heights Development Corporation the weekend of October 9, 2009.

 b. On account of said contempt, [Wife] shall pay to the Jefferson County General Fund within **SIXTY (60) DAYS** a fine in the amount of $10,000.00, which fine shall be suspended on the condition that [Wife] does not enter any of the businesses she knows to be owned or operated by [Husband] or Monroe Heights Development Corporation.

 c. [Wife] shall, within **THIRTY (30) DAYS,** issue a check or money order, payable to Cassandra M. Neely, Esquire, [Husband's attorney] in the amount of $4,442.40.

 d. In all other respects, [Husband's] petition is **denied.**

Trial Court Order, 11/8/11 (emphasis in original).

To understand the November 8th order, we provide a synopsis of the pertinent facts as found by the trial court that specifically relate to the Corporation, which was formed in 1991 by Husband and Wife to maintain a business for the ownership and operation of motels. Husband and Wife each owned 50% of the stock of the Corporation with Husband serving as president and vice-president, handling the building and maintenance of the properties and all future planning.[1] Wife served as secretary and treasurer, directing the management of the motels, overseeing the staff and dealing with all the necessary daily operations. The first motel was opened in 1995, and the parties resided there until five years later when they moved into the second motel owned by MHD. When necessary Husband provided additional funding from his gas and oil interests and Wife invested a $100,000 inheritance she received from a relative.

With regard to what occurred shortly before and after the parties' separation, the trial court explained:

As the sole shareholders and officers of MHD, [Wife] and [Husband] mostly treated the corporation as an extension of themselves. Accordingly, they discussed most corporate issues around the dinner table and made decisions large and small in the comfort of their own home. They also observed basic corporate formalities, passed corporate resolutions when necessary and kept separate corporate bank accounts, however. Yet it was not until the parties' relationship soured that [Husband] began demanding formal, organized meetings and monthly accountings from [Wife].

Although [Wife's] official status in MHD had not changed by June 2007, [Husband], without providing notice to his wife, held a special meeting asking the Board of Directors to appoint a secretary and authorize [Husband] to act as the sole signatory on all MHD bank accounts. The Board ultimately granted [Husband] that authority and [he] appointed his daughter, Pauline Fleming, as MHD's secretary. [Wife] became aware of [Husband's] attempts to exclude her from MHD when he showed her a letter he had drafted advising her that her computer access was closed; that she could no longer sign checks and the bank would not honor any she had signed; that she could not enter onto MHD property; that she could not call any existing employees; and that the police and employees would be notified of her termination. He further demanded that she return any company property in her possession and notified her that his P.O. Box keys and the lock on her office door would be changed. [Wife] filed for divorce shortly thereafter.

Trial Court Opinion (T.C.O.), 11/8/11, at 3.

On September 26, 2008, the parties executed the MSA. In disposing of their marital estate, the parties "specifically agreed to indemnify one another and waive and relinquish any and all claims and interest relative to the identified assets." *Id.* at 4. The MSA provided that Husband retained ownership of multiple corporations and property and indemnified Wife as to those assets. As for the Corporation, which was addressed separately in the MSA, the trial court explained:

Addressing MHD specifically, the Agreement specified that [Husband] would assume sole and exclusive ownership of the corporation as of June 30,

---

1. Husband also had other business interests in several oil and gas companies.

2008, at 3:00 p.m., by which time [Wife] was to have turned over all corporate records, computer passwords, and other MHD items, documents, and information in her possession. Two paragraphs later, the parties referenced "Schedule A" and "Schedule B" as representing all of MHD's liabilities "to the best of their knowledge" and, paragraph I.T. notwithstanding, agreed that each would, on or before June 30, 2009, satisfy any later disclosed debts that he or she had personally incurred on behalf of MHD. [Agreement, ¶ I.H.]. They further provided that the Court would resolve any issues upon which they could not agree relating to corporate debt and the payment thereof. Effecting their own statute of limitations, however, they concluded, "Effective June 30, 2009, all claims as to undisclosed corporate debt not yet discovered shall expire." [Agreement I.H.].

Recognizing that paragraph I.H. set an absolute deadline for raising any claims of [Wife's] undisclosed debt relative to MHD, [Husband] later identified four categories of liabilities for which he sought to hold [Wife] responsible. Those included 1.) past due interest on a public credit loan; 2.) unpaid payroll taxes; 3.) unpaid workers' compensation taxes; and 4.) undisclosed loans between MHD and other entities. This list was received at [Wife's] attorney's office via facsimile on June 30, 2009—the last possible date—at 4:34 p.m. No further details were provided, however, only defense counsel's statement that "Mr. Habjan is in the process of getting final figures and documentation concerning these liabilities." ... "Once I receive

them," she noted, "I will provide them to you."

*Id.* at 4–5 (some citations to the MSA omitted). The court then noted in its opinion that no final figures and/or documentation were ever provided to [Wife], nor were they provided to the court at any point prior to or at the last hearing held in this matter. Also, one of the incidents discussed by the court involved Wife's staying at one of the motels with friends that the court concluded was a deliberate effort on Wife's part to annoy Husband. Additionally, the court referenced other occurrences and the orders it had issued to compel the parties to abide by the MSA. *See* Order, 8/17/09 (directing parties to abide by the terms of the MSA).

Then, on August 19, 2010, the Corporation filed suit in the Clarion County Court of Common Pleas against Wife. Husband, who at a minimum retained a majority interest in the Corporation,[2] verified the complaint as MHD's president. The trial court provided the following explanation as to the background of the Clarion County action:

In Clarion County, [the complaint] alleged that [Wife], while still an officer and executive director of MHD, and thus while standing in a fiduciary relationship with the corporation, had breached her fiduciary duty, as well as her duties of faithfulness, honesty, and loyalty, in eight different ways: 1.) by making personal use of cash paid by registered guests; 2.) by reimbursing herself with corporate funds for expenses not actually incurred on behalf of MHD; 3.) by using corporate credit cards for personal expenses and travel; 4.) by authorizing false reimbursements to employees, knowing that they were

---

**2.** Nothing was presented to the trial court that revealed that the Corporation was owned even in part by any other investors.

using the funds for personal expenses; 5.) by authorizing padded expense reports and retaining the amounts exceeding the employees' actual expenses; 6.) by retaining restitution funds due and owing to MHD by a former employee; 7.) by taking and keeping corporate furnishings and equipment; and 8.) by taking money from vending machines located in one or more of the motels.

The Clarion County complaint further alleged that [Wife] had prevented the discovery of her activities in various ways, including by altering corporate records, pass-protecting corporate computers, deleting corporate correspondence, maintaining exclusive possession of MHD's credit cards and associated records, and directing employees to withhold information from [Husband].

That was not the first time [Husband] had raised those and similar issues in the context of a legal action. Rather, in a 6-page document asking the Court to dismiss its September 20, 2007, Order and Rule to Show Cause, he expressly or implicitly addressed all but item 8.). Pet. Exh.3. He again raised many of them, including item 8.), in a Petition for Emergency Special Relief, filed November 30, 2007. The aforementioned January 30, 2008[ ] Consent Order purported to resolve some of those issues, and [Husband] therein agreed to withdraw his Petition.

[Husband] next filed a Petition for Emergency Special Relief on May 22, 2008, claiming that [Wife] had, *inter alia*, taken MHD furniture, decorations, and other items for her personal use; retained cash payments from hotel guests and vendors; and generally misappropriated corporate funds and property for her personal use. [Wife] also filed a Petition for Special Relief around that time. The parties agreed to continue the scheduled hearing, however, with the understanding that they would be resolving their respective issues. That resolution took the form of the September 26, 2008, Marital Settlement Agreement.

T.C.O. at 10–11.

The most recent filings that give rise to the instant appeal were Wife's November 9, 2010 petition for contempt and enforcement of the MSA, and Husband's petition for contempt and special relief, which he filed on January 21, 2011. Hearings were held before the trial court on April 26, 2011, June 10, 2011, July 15, 2011, and August 29, 2011. On November 8, 2011, the trial court issued the order set forth in its entirety at the beginning of this opinion.[3]

Now, on appeal, Husband raises the following five issues for our review:

I. Did the trial court err in finding that the Corporation was an extension of Husband and his alter ego, and not a separate corporate entity, even though the Corporation was dominated and controlled by Wife throughout the marriage and the Corporation followed corporate formalities?

II. Did the trial court err in finding that the general waiver and release provisions of the [MSA] between Husband and Wife were legally binding on the

---

**3.** In conjunction with his appeal, Husband also petitioned for a stay and supersedeas pending appeal, which the trial court granted on December 19, 2011, along with a requirement that Husband file security in the sum of $50,000 and cause a stay to be issued in the Clarion County case. Husband then filed a motion for reconsideration, requesting a reduction of the security amount to $25,000, which was granted by order dated January 10, 2012.

Corporation even though it was not a party or signatory to the Agreement?

III. Did the trial court err in finding Husband to be in contempt of its August 17, 2009, order of court and the parties' [MSA] as a result of the lawsuit filed by the Corporation against Wife in Clarion County?

IV. Did the trial court err in ordering Husband to pay Wife's attorney fees in the divorce contempt action and to pay Wife's attorney fees related to the Clarion County lawsuit between the Corporation and Wife?

V. Did the trial court err in finding that Husband's claims for various debts not disclosed in the [MSA] had expired even though Husband gave Wife notice of the debts by the deadline called for in the [MSA]?

Husband's brief at 4–5.

■■■ "When considering an appeal from an [o]rder holding a party in contempt for failure to comply with a court [o]rder, our scope of review is narrow: we will reverse only upon a showing the court abused its discretion." *Harcar v. Harcar,* 982 A.2d 1230, 1234 (Pa.Super.2009) (quoting *Hopkins v. Byes,* 954 A.2d 654, 655 (Pa.Super.2008)). We also must consider that:

> Each court is the exclusive judge of contempts against its process. The contempt power is essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute. When reviewing an appeal from a contempt order, the appellate court must place great reliance upon the discretion of the trial judge.

*Langendorfer v. Spearman,* 797 A.2d 303, 307 (Pa.Super.2002) (quoting *Garr v. Peters,* 773 A.2d 183, 189 (Pa.Super.2001)). "The court abuses its discretion if it misapplies the law or exercises its discretion in a manner lacking reason." *Godfrey v.*

*Godfrey,* 894 A.2d 776, 780 (Pa.Super.2006). Additionally, "[i]n proceedings for civil contempt of court, the general rule is that the burden of proof rests with the complaining party to demonstrate, by [a] preponderance of the evidence that the defendant is in noncompliance with a court order." *Lachat v. Hinchcliffe,* 769 A.2d 481, 488 (Pa.Super.2001). However, "a mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt." *Id.* Moreover, we recognize that:

> To sustain a finding of civil contempt, the complainant must prove certain distinct elements: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent.

*Stahl v. Redcay,* 897 A.2d 478, 489 (Pa.Super.2006).

Husband's questions deal in part with the trial court's determination to "pierce the corporate veil" and to consider Husband and the Corporation as a single entity with regard to the filing of the Clarion County case and the interpretation of the MSA's waiver and release provisions.

■■■ The general standard for piercing the corporate veil is as follows:

> The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, . . . and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. . . . We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or

her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

*Ashley v. Ashley*, 482 Pa. 228, 237, 393 A.2d 637, 641 (1978); *Barium Steel Corp. v. Wiley*, 379 Pa. 38, 108 A.2d 336 (1954) (plurality).

*Village of Camelback v. Carr*, 371 Pa.Super. 452, 538 A.2d 528, 532–33 (1988).

■ To support his first claim that the trial court erred in requiring him to discontinue the Clarion County case, Husband argues that that case is a distinct, legitimate action by the Corporation against Wife "for actions she took while she was a shareholder, officer, Executive Director and de facto chief operating officer of the Corporation." Husband's brief at 17. Husband further contends that the court should not have pierced the corporate veil and treated him and MHD as one and the same. *Id.* Husband relies on *Rinck v. Rinck*, 526 A.2d 1221 (Pa.Super.1987), which was also cited by the trial court in its opinion. *Rinck* is a contempt action in the context of a divorce that deals with the alter ego theory, wherein the marital settlement agreement required the husband to pay alimony in an amount equal to one-third of his gross income. The husband formed a corporation after the agreement was signed and thereby set his own salary, thus, lowering the amount he had to pay to his former spouse. On appeal, this Court held that the corporate entity could be "disregarded whenever it is necessary to avoid injustice. Where, as here, a corporation has been formed to escape an existing legal obligation, the corporate entity will be ignored." *Id.* at 1223.

Husband attempts to distinguish the facts in the *Rinck* case from those found here. He identifies the fact that in *Rinck*, the husband formed the corporation after the parties signed their marriage settlement agreement, while in the instant case

MHD was incorporated by the parties in 1991, long before the MSA was signed. Husband also distinguishes *Rinck* because in that case there were no findings that corporate formalities were followed, yet here Husband claims that basic corporate formalities were followed even though the trial court found them to be insignificant. Husband further noted that in *Rinck* the husband had sole control of the corporation at all times, while Husband here claims that Wife rather than Husband controlled the Corporation until shortly before the parties signed the MSA.

Wife responds by indicating that although Husband asserts that the Clarion County suit is based upon information and documentation that he found after the parties entered into the MSA, the record reveals that the same claims were raised by Husband "in his handwritten document in October 2007[,]" in his "Petitions for Special Relief filed in November 2007 ... and again in May 2008 ...[,] months prior to the parties' execution of the Agreement on September 26, 2008." Wife's brief at 19. Wife also identifies the trial court's findings set forth on page 10 of its opinion, which we have previously quoted in this opinion. She notes that the court found Husband's claims and those of the Corporation in the Clarion County case to be similar. *Id.* Finally, Wife asserts that the trial court correctly held that Husband could not "selectively invoke the Corporate existence in an effort to evade his legal obligations as set forth in the Agreement by later bringing the same claims against Wife which he had previously raised during the divorce proceedings under the guise of the corporate entity in the Clarion Lawsuit." *Id.* at 20.

In addressing Husband's arguments regarding a finding of contempt based on the filing of the Clarion County case, the trial court explained:

[W]hen [Husband], acting as president of MHD, sued [Wife] in Clarion County, he did so in contempt of the [c]ourt's August 17, 2009, order directing him to comply with the terms of the MSA. He knew that the MSA exempted [Wife] from future liability for any of the claims raised in the Clarion County complaint. Indeed, he had attempted to raise them in [the divorce action] in Jefferson County previously and, being an intelligent and educated man, no doubt realized that the parties' multiple stipulations and the MSA foreclosed him from further litigating them in this divorce action. Having apparently decided that he deserved more from [Wife], however, he decided to circumvent his contractual obligation by suing her in the corporation's name. His conduct in that regard was unquestionably volitional and propelled by wrongful intent.

[Husband] cannot hide behind the façade of the corporate entity to avoid a finding of contempt, either. Nearly two years after executing the Agreement that he helped to draft, he, as president of the corporation, verified the complaint in *Monroe Heights Development Corporation, Inc. v. Diane S. Habjan*. He was more than just president of an independent corporation, however, because on September 26, 2008, he had assumed full ownership of MHD. For all intents and purposes, therefore, he *was* MHD in August of 2010, and the decision to sue [Wife] was not one made by a majority vote over which he had little influence. Accordingly, although one may distinguish the facts, the legal principle espoused in *Rinck v. Rinck* [363 Pa.Super. 593], 526 A.2d 1221 (Pa.Super.1987), is well adapted to these facts:

> Appellant argues that the corporate veil cannot be pierced unless the court makes a specific finding that he used his professional corporation to commit fraud, illegality or wrongdoing. This is a statement frequently made in the decided cases. See: 8A P.L.E. Corporations § 3. Appellant's reliance on this general language, however, fails to acknowledge the scope of the rule which permits the separate corporate entity to be disregarded whenever it is necessary to avoid injustice.

*Id.* at 1223.

T.C.O. at 14 (emphasis in original). Therefore, despite the factual distinctions between this case and *Rinck*, the court here concluded that Husband was attempting to avoid an existing legal obligation, *i.e.*, because he could no longer allege causes of action against Wife in the divorce action, he sought another avenue. Thus, the court concluded that it would "not permit [Husband] to so blatantly disregard the legal obligation to which he voluntarily bound himself simply by placing a corporate name rather than his own on a case caption." *Id.* at 15.

Having reviewed the record, we conclude that the trial court's findings are supported by the evidence. Moreover, we conclude that the court did not abuse its discretion by finding that Husband used his control of MHD to further his own personal interest. The court did not err in piercing the corporate veil and finding Husband in contempt for violating the parties' MSA and the court's order compelling the parties to comply with the MSA. The filing of the suit against Wife in Clarion County was simply another way of trying to obtain what he apparently believed he had not secured for himself in the divorce action.

■ The conclusion reached above as to the Clarion County lawsuit impacts the decision regarding Husband's second question in which he attempts to persuade this Court that the trial court applied the MSA,

entered into by Husband and Wife, to the Corporation, an entity that is not a signatory/party to the MSA. In particular, Husband focuses on the release language found in the Agreement to persuade this Court that that language cannot be used to waive the Corporation's claims against Wife because the Agreement only binds Husband and Wife.

In addressing this issue, we are guided by the following:

> In Pennsylvania, we enforce property settlement agreements between husband and wife in accordance with the same rules applying to contract interpretation. *Lyons v. Lyons,* 401 Pa.Super. 271, 585 A.2d 42, 45 (Pa.Super.1991). A court may construe or interpret a consent decree as it would a contract, but it has neither the power nor the authority to modify or vary the decree unless there has been fraud, accident or mistake. *Penn Township* [*v. Watts,* 152 Pa. Cmwlth. 359, 618 A.2d 1244, 1247 (Pa. Cmwlth.1992) ] . . . .
>
> It is well-established that the paramount goal of contract interpretation is to ascertain and give effect to the parties' intent. *Lyons v. Lyons, supra.* When the trier of fact has determined the intent of the parties to a contract, an appellate court will defer to that determination if it is supported by the evidence. *Id.*
>
> When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties understanding. *Creeks v. Creeks,* 422 Pa.Super. 432, 619 A.2d 754, 756 (Pa.Super.1993). The court must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation. *Id.* When the terms of a written contract are clear, this Court will not re-write it or give it a construc-

tion in conflict with the accepted and plain meaning of the language used. *Id.* *Lang v. Meske,* 850 A.2d 737, 739–40 (Pa.Super.2004).

To support his claim that the Corporation is not bound by the waiver and release portions of the MSA, Husband describes the layout of the Agreement. Specifically, Husband explains that paragraphs I.F. through I.J. concern the Corporation, and those paragraphs do not mention the release of claims against Wife. Husband then notes that paragraph I.N. lists property other than the Corporation that the parties agreed would be retained by Husband as his separate property. That paragraph ends with the following language:

> Husband hereby agrees to indemnify and hold Wife harmless from all liabilities with respect to ownership, operation taxes due and/or all other liabilities and/or obligations arising from ownership and/or operation of all of the foregoing business entities or assets, whether such claims arise prior to or subsequent to the signing of this Agreement. Husband shall fully indemnify and save Wife harmless in all matters relating thereto, including payment of all attorney fees, costs and expenses incurred to defend Wife's interest with regard to any such claims or liabilities.

MSA, at I.N. (page 8). Thus, Husband claims that the release language in paragraph I.N. referring to the "foregoing business entities" discussed in that paragraph does not apply to MHD.

Husband next identifies paragraph I.T. of the MSA, which provides:

> Subject to the provisions of this Agreement, each party has released and discharged and by this Agreement does himself or herself and for his or her heirs, legal representatives, executors,

administrators and assigns release and discharge the other of and from all causes of action, claims, rights or demands whatsoever in law or in equity which either of the parties ever had or now has against the other, except any and all causes of action for divorce.

Agreement, ¶ I.T. This paragraph concludes the portion of the Agreement that concerns the entire settlement of all the property divided by the parties. Husband selects certain phrasing, such as "each party," "for himself or herself," and "for his and her," suggesting that this use of terminology "is clear and unambiguous that the intent of the parties was *not* to bind the settlement agreement to [the] Corporation." Husband's brief at 24 (emphasis in original).

Husband also cites *Ford Motor Co. v. Buseman*, 954 A.2d 580 (Pa.Super.2008), a case dealing with a release signed by the administratrix of the estate of a victim in a car accident. The language of the release, signed in conjunction with a settlement between the victim and the driver of the other vehicle, contained broad language to the extent that the administratrix's suit against Ford Motor Company and other unnamed entities was barred. Specifically, this Court stated:

> [W]hen construing the effect and scope of a release, the court, as it does with all other contracts, must try to give effect to the intentions of the parties. Yet, the primary source of the court's understanding of the parties' intent must be the document itself. Thus, what a party now claims to have intended is not as important as the intent that we glean from a reading of the document itself. The parties' intent at the time of signing as embodied in the ordinary meaning of the words of the document is our primary concern.

*Brown v. Cooke*, 707 A.2d 231, 233 (Pa.Super.1998) (quotation and citations omitted). "The court will adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement...." *Harrity v. Medical College of Pennsylvania Hospital*, 439 Pa.Super. 10, 653 A.2d 5, 10 (Pa.Super.1994) (quotation and citations omitted). There is no requirement that all of the parties to be discharged from liability are specifically named within a release if the terms of the release clearly extend to other parties. *See In re Bodnar's Estate*, 472 Pa. 383, 372 A.2d 746 (1977). The Pennsylvania Supreme Court has held that when the terms of a release discharge all claims and parties, the release is applicable to all tortfeasors despite the fact that they were not specifically named and did not contribute toward the settlement. *Buttermore v. Aliquippa Hospital*, 522 Pa. 325, 561 A.2d 733 (1989).

*Buseman*, 954 A.2d at 583. Husband suggests that the release in Buseman was much more expansive than the language of the release contained in the parties' MSA and that, therefore, the trial court should not have applied the release language here to the Corporation.

We disagree and note Wife's reliance on *Rohmer Assoc., Inc. v. Rohmer*, 36 A.D.3d 990, 830 N.Y.S.2d 356 (2007), a New York state case. The *Rohmer* court held that the parties' release contained in their property settlement agreement in connection with their matrimonial action operated as a waiver of any claims asserted by the husband or the corporation, wholly owned by the husband, in this separate action by the corporation against the wife for allegedly misappropriating some of the corporation's funds. The factual basis in *Rohmer* is similar to the facts here. The

corporation in *Rohmer* was controlled by the husband at the time the corporation filed a suit against the wife and the claims were the same as those raised by the husband in the divorce action. The court determined that the "corporate form may be disregarded to achieve an equitable result. . . ." *Id.* at 358.

Although the *Rohmer* case is not precedential, its reasoning is persuasive. Moreover, because we concluded in conjunction with Husband's first issue that the trial court properly pierced the corporate veil, it follows that the release language in paragraph I.T. was properly interpreted to cover both Husband's and the Corporation's actions. The trial court construed the language in paragraph I.T. as releasing the parties from each other's claims without restriction. The language therefore also released Wife from claims alleged by the Corporation, particularly because those claims were the same as the ones raised by Husband on numerous occasions during the divorce action.

Our review recognizes that the trial court determined that the intent of the parties discerned from the language of the MSA was to release each other from all claims. That said, with the conclusion that the Corporation was the alter ego of Husband, the Corporation likewise must release Wife from any of those same claims. Accordingly, we conclude that Husband's second issue is without merit.

With regard to Husband's third issue, he claims the trial court erred in finding him in contempt of the August 17, 2009 order and of the MSA. This claim is intertwined with his first and second arguments. In fact, Husband states that the trial court erred "1) in finding that the Corporation was Husband's 'alter ego,' 2) in piercing the corporate veil, and 3) [ ] finding that the general waiver language in the Agreement as to claims between the parties also

applied to the Corporation. . . ." Husband's brief at 30. Because these separate arguments have already been addressed and have not been decided in Husband's favor, we conclude, as well, that the court's finding of Husband in contempt must be upheld. The elements set forth in the *Stahl* decision have been met. *See Stahl,* 897 A.2d at 489. Thus, Husband's third issue does not provide him with any relief.

 Husband's fourth issue also relies on his prior arguments set forth in this appeal to support his contention that the trial court should not have imposed upon him the payment of Wife's counsel fees in both the contempt action and the Clarion County lawsuit.

Our standard of review of the award of counsel fees pursuant to the Domestic Relations Code is for an abuse of discretion. *See Bowser v. Blom,* 569 Pa. 609, 807 A.2d 830, 834 (Pa.2002). An abuse of discretion is "[n]ot merely an error of judgment, but if in reaching a conclusion[,] the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record." *Id.* (citations omitted). "[R]eview of the grant of counsel fees is limited . . . and we will reverse only upon a showing of plain error." *Isralsky v. Isralsky,* 824 A.2d 1178, 1192 (Pa.Super.2003) (citation omitted).

*Kraisinger v. Kraisinger,* 34 A.3d 168, 175 (Pa.Super.2011). Additionally, Section 3502 of the Domestic Relations Code provides:

(e) **Powers of the court.**—If, at any time, a party has failed to comply with . . . the terms of an agreement as entered into between the parties, after hearing, the court may, in addition to any other remedy available under this

part, in order to effect compliance with its order:

....

(7) award counsel fees and costs;

23 Pa.C.S. § 3502(e)(7).

■ Based upon our conclusion that the trial court correctly found that Husband had failed to comply with the terms of the MSA and the court's order directing compliance and that Wife had incurred attorney's fees to defend the Clarion County action and to pursue enforcement of the MSA, we further conclude that the trial court did not abuse its discretion by awarding attorney's fees to Wife. *See Miller v. Miller,* 983 A.2d 736, 743–45 (Pa.Super.2009) (concluding that court was empowered to award attorney's fees to wife after husband failed to comply with the terms of the parties' agreement).

■ In Husband's last issue, he contends that the trial court erred by finding his "claims for past due interest on a public credit loan, unpaid payroll taxes, and unpaid workers' compensation taxes had expired." Husband's brief at 34. He indicates that he gave Wife notice by the date established in the MSA, but acknowledges that he did not have exact dollar amounts relating to these items. Specifically, Husband claims that his inability to establish exact figures was due to the continuing of negotiations with the governmental agencies involved and that any delay would not prejudice Wife. Moreover, with reliance on *Wilson v. King of Prussia Enterprises, Inc.,* 422 Pa. 128, 221 A.2d 123 (1966), Husband contends that "the issue is whether, under the circumstances of the particular case, a party is guilty of want of due diligence[ ]" and that he "has been diligent in trying to address these issues." *Id.*

In its opinion, the trial court recognized that the MSA contained the June 30, 2009

date, which essentially established a statute of limitations by which time all claims related to corporate debt and its payment had to be satisfied by the party incurring that debt on behalf of the Corporation. *See* T.C.O. at 4. The court then quoted the Agreement, stating that "Effective June 30, 2009, all claims as to undisclosed corporate debt not yet discovered shall expire." *Id.* at 5 (quoting Agreement at I.H.). Relative to this issue, the court found that Husband waited until the last day to raise these claims and "then wait[ed] two more years to divulge a single number in support thereof[.]" *Id.* at 19. Thus, the court held that "[Husband] forfeited his ability to recover on any of [the alleged debts] under the terms of the Agreement." *Id.* The court then explained its reasoning underlying this conclusion, stating:

In addition to having allowed his claims to expire, [Husband] failed to prove them by a preponderance of the evidence. As the [c]ourt noted above, the only numbers he offered that were not entirely speculative were those pertaining to the past due interest and the amount he had allegedly spent satisfying that debt. Considering his questionable credibility with respect to matters tending to impose liability on [Wife], however, the [c]ourt is unwilling to accept his testimony alone as sufficient proof of past interest due. With respect to the taxes, moreover, [Husband], as the petitioner on that issue, had the burden of proving that they were owed; in what amount they were owed; and that it was [Wife] who had incurred that debt on behalf of MHD. He did not. Rather, more than two years having elapsed from the date of the fax until the date he testified, [Husband] could only identify the original assessments and speculate about what the final numbers would be at the conclusion of his appeal. That is not the level of proof the law requires,

644

and certainly not one this [c]ourt is willing to accept.

T.C.O. at 19.

 "[T]his Court defers to the credibility determinations of the trial court with regard to the witnesses who appeared before it, as that court has had the opportunity to observe their demeanor." *Harcar*, 982 A.2d at 1236 (quoting *Garr*, 773 A.2d at 189). Our review of the record reveals that the trial court's findings are supported by the testimony and the evidence. Because we do not make credibility assessments, we will not disturb the trial court's decision. It follows that the court did not believe that Husband was diligent in securing the necessary information to support his claims regarding the corporate debt allegedly incurred by Wife. Accordingly, we conclude that Husband's final issue does not afford him relief.

Order affirmed.