J-S02017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KINGSLEY CHIN, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIM WALKER-CHIN | : | No. 2118 EDA 2018 |

Appeal from the Order Entered, June 29, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s):  8460 March Term 2007.

BEFORE:  GANTMAN, P.J.E., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                **FILED APRIL 23, 2019**

The impetus for this appeal is noncompliance with a divorce settlement agreement.  Both parties petitioned the family court to enforce the agreement, and both petitioned the court to find the other in contempt.  Only Kim Walker-Chin (Wife) was successful.  Dr. Kingsley Chin (Husband) appeals.  After review, we affirm in part and reverse in part.

This case has particularly tortured procedural history.  The relevant facts are these:

In September 2008, the parties settled their divorce via a property settlement agreement (PSA), which was incorporated but not merged with the decree.  In 2015, Wife brought an action to enforce the PSA following Husband's noncompliance.  She also petitioned the trial court to find him in contempt.  Husband counterclaimed, also seeking enforcement and contempt.

Over a two-year stretch, the court conducted hearings, issued a series of interim orders and even signed a bench warrant for Husband's arrest. The litigation culminated with final order on June 29, 2018, wherein the court determined, *inter alia*:

- Wife is not in contempt for her failure to refinance marital property.

- Husband is in contempt for his failure to comply with the December 23, 2015 enforcement order.

- Husband shall pay Wife $105,010 to account for the outstanding "Mantis" balance; Husband to pay Wife interest on the outstanding Mantis balance in the amount of $21,382.66.

- The parties stipulated that Husband owes Wife $1,023,673 under the terms of their PSA; Husband shall pay Wife interest on this sum in the amount of $28,709.80.

- Husband shall pay Wife counsel fees in the amount of $37,893 and costs in the amount of $21,415. Payment is due by October 1, 2018.

- If Husband does not have the liquid assets necessary to pay Wife, Husband shall file amended tax returns by August 15, 2018.

*See* Order of Court, dated June 29, 2018.

Husband filed this timely appeal. Although his brief contains 11 intertwined questions involved, he addresses some issues together. *See* Husband's Brief at 8-11. We have condensed them to nine questions. We restate those issues and reorder them for clarity and ease of disposition:

1. Did the trial court abuse its discretion in concluding that Wife's efforts to refinance mortgages on martial

real estate from 2008-2012 were sufficient to overcome a finding of contempt?

2. Did the trial court abuse its discretion in granting Wife's Petition for Contempt despite the fact that she had unclean hands for failing to refinance?

3. Did the trial court abuse its discretion by concluding that Husband was in contempt because he had a present ability to pay?

4. Did the trial court abuse its discretion in failing to consider how Wife's failure to refinance and make mortgage payments impacted Husband's ability to comply with the court's enforcement order and the parties' agreement?

5. Did the trial court abuse its discretion in determining that Husband had not complied with the property settlement agreement regarding the Mantis payments?

6. Did the trial court abuse its discretion in determining that Husband owed interest on the Mantis payments?

7. Did the trial court abuse its discretion in calculating how much interest Husband owed on the $1.5 million property transfer?

8. Did the trial court abuse its discretion by requiring Husband to pay Wife's counsel and expert fees?

9. Did the trial court abuse its discretion in issuing arbitrary deadlines for Husband to comply with its enforcement orders?

*See id*.

Regarding contempt orders, our scope of review is very narrow, and we place great reliance on the court's discretion. ***Thomas v. Thomas***, 194 A.3d 220, 225 (Pa. Super. 2018) (citation omitted).  The court abuses its discretion if it misapplies the law or exercises its discretion in a manner lacking reason.

*Id*. (Citing ***Harcar v. Harcar***, 982 A.2d 1230, 1234 (Pa. Super. 2009). Each court is the exclusive judge of contempts against its process. The contempt power is essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute. *Id*. (Citing ***Habjan v. Habjan***, 73 A.3d 630, 637 (Pa. Super. 2013). Absent an error of law or an abuse of discretion, we will not disrupt a finding of civil contempt if the record supports the court's findings. *Id*. (Citation omitted).

We begin with Husband's first two claims that the trial court must have found Wife in contempt when she failed to refinance certain mortgages, pursuant to their PSA.  Specifically, Husband argues that Wife had the income to refinance.  ***See*** Husband's Brief at 8, ¶2; 33.  He concludes that her failure to refinance rendered her hands unclean, which should have negated the contempt finding against him. ***See id***. at 49-53.

In proceedings for civil contempt of court, the general rule is that the burden of proof rests with the complaining party to demonstrate that the defendant is in noncompliance with a court order. ***MacDougall v. MacDougall***, 49 A.3d 890, 892 (Pa. Super. 2012).  "To sustain a finding of civil contempt, the complainant must prove, by a preponderance of the evidence, that: (1) the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) the act constituting the contemnor's violation was volitional; and (3) the contemnor acted with wrongful intent." ***Id***.

- 4 -

Nevertheless, "a mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt." *Habjan*, 73 A.3d at 637. "If the alleged contemnor is unable to perform and has, in good faith, attempted to comply with the court order, then contempt is not proven." *Cunningham v. Cunningham*, 182 A.3d 464, 471 (Pa. Super. 2018).

Moreover, the doctrine of unclean hands provides that a court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. *See Morgan v. Morgan*, 193 A.3d 999, 1005 (Pa. Super. 2018) (citations omitted). The doctrine of unclean hands gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant; and in exercising this discretion, the court is free to refuse to apply the doctrine if consideration of the record as a whole convinces the court that application of the doctrine will cause an inequitable result. *Id.* (Citation omitted).

The trial court thoroughly delineated the reasons why Wife's failure to refinance did not constitute contempt or render her hands unclean:

> Per Paragraph 1 of the Agreement, [Wife] was to refinance units [at the Walnut Street address] and [the Pearl Street address] no later than December 31, 2008. [Wife] testified and provided proof that [two units of the Walnut Street property] were paid off on May 23, 2016, and she consumed the loan on [the third unit of Walnut Street property]. [Wife] was unable to refinance the mortgage on the Pearl Street address. [Wife] testified credibly that she had difficulty in refinancing the properties due to the bank crisis of 2008, her debt to income ratio, her diagnosis of breast cancer in

2011, [and] her lack of employment during her treatment for cancer[.] [Wife] testified as to her efforts to refinance the properties and the denials she received numerous times. Exhibit W5 was offered as some examples of [Wife's] efforts to refinance the properties through Chase and Citizens Bank. Whenever [Wife] received lump sums of money owed [by Husband under the settlement agreement], she utilized those monies to pay down the mortgages owed on the properties in question.

On cross-examination when asked what proof she had that she made efforts to refinance in 2008, 2009, 2010, 2011, and 2012, [Wife] responded that her attorney could produce the applications. Inquiring counsel did not request the application from [Wife's] counsel. [Wife] went on to testify that she made six attempts to refinance the properties through Berkshire Bank, Northern Bank, PNC Bank, Chase, Citizen Bank, and Ditech.

[Wife] testified that she received $105,900 in rents in 2014, and that her overall mortgage obligation was $102,420. [Wife] testified that she did not know her total income for 2014, but could produce the documents with her income for 2014. Inquiring counsel did not request the documents. When asked on cross if one of the reasons she was unable to refinance the properties was because her debt on the properties significantly outweighed her income, [Wife] answered in the affirmative. [Wife] was aware of the Agreement and she signed it on or about September 3, 2008. When [Wife] failed to refinance the properties on or before December 31, 2008 she violated the Agreement.

However, based on [Wife's] credible testimony, her violation of the Agreement was not willful, as she lacked the ability to refinance the properties in her name alone. [Wife] made good faith efforts to refinance the properties prior to the December 31, 2008 deadline and continued thereafter to make good faith efforts to refinance the properties in her own name. Since [Wife's] noncompliance with the Agreement did not reflect the requisite wrongful intent, the trial court did not find her in civil contempt.

*See* Trial Court Opinion, 9/28/18, at 10-12 (citations to the transcript omitted).

Although Husband believed that Wife had more than sufficient income to refinance, the banks evidently did not. Neither did the trial court. The record supports this determination. Wife's efforts to abide by the terms of the PSA were thwarted by circumstances outside of her control. We conclude that the court did not abuse its discretion when it found that Wife did not act with wrongful intent when she failed to refinance. We similarly conclude that Wife did not act with unclean hands. Husband's first two issues are without merit.

In his third and fourth issues, Husband claims the court erred when it found him in contempt, because he had asserted as an affirmative defense his inability to pay. Specifically, Husband argues that Wife's failure to refinance hurt his credit score, which in turn, rendered him unable to obtain personal loans necessary to comply with either the PSA or the court's order from December 2015 enforcing the same. *See* Husband's Brief at 8-9, ¶¶ 4-6. He explains that when Wife fell behind on the mortgage payments, Husband's credit score dropped drastically. *See id*. at 37-40.

While the burden is on the complaining party to prove noncompliance by a preponderance of the evidence, the "present inability to comply is an affirmative defense which must be proved by the alleged contemnor." *Cunningham*, 182 A.3d at 471-472 (Pa. Super. 2018) (citation committed). Here, Husband had the burden of showing that he was unable to comply with the court's enforcement of the PSA.

The trial court determined that Husband had the ability to pay Wife. Again, the court thoroughly addressed its reasons in its Rule 1925(a) opinion:

[Husband] admitted that he continued to owe [Wife] money despite owning assets with significant value. [Husband] testified that he signed a loan application to purchase a home in 2015, which stated that he owned $5 million dollars in assets and had a net worth of $2.7 million dollars.

Exhibit W8 consisted of draft financials for a specific company (companies are not being specifically identified to maintain confidentiality), and it was provided to [Wife] by [Husband]. It listed $6,549,463.00 as the total shareholders' equity for a certain company as of August 2016. The chief financial officer for KIC Management Group testified that [Husband] owns roughly 98.5% of said company. Exhibit W9 consisted of consolidated draft financials for a certain company, and it was provided to [Wife] by [Husband]. It listed $1,570,721 in total equity for a certain company for a period from January 1, 2015 to December 31, 2015. (*See* Exhibit W9). The chief financial officer for KIC Management Group testified that [Husband] owns over 99% of said company. The chief financial officer affirmed that there is $8,000,000 (eight million dollars) in equity value within the two companies. While equity is not cash, there are no legal restrictions on the companies, and [Husband] is free to sell the companies at will.

[Wife's] expert witness, certified in financial forensics, testified that [Husband's] 2016 tax return reflects an overpayment of $467,393, and that the overpayment can be obtained for use by [Husband]. [Husband's] personal and business accountant confirmed the overpayment listed in [Husband's] 2016 tax return. The accountant testified that the 2016 tax return would be amended due to a recently discovered error, but that a sizable overpayment would remain available for use by [Husband].

[Wife's] expert witness testified that [Husband] could file a net operating loss carryback claim to recoup approximately $676,945 in taxes. The expert also testified that by amending [Husband's] 2013 tax return to recoup the net operating loss, and amending [Husband's] 2016 tax return

to collect the overpayment, [Husband] would have over $1,000,000 available to [Wife]. [Husband's] accountant confirmed [Wife's] expert's assertions.

The expert also looked at K1s and income available to [Husband] and noted "that in 2016 there were several K1s that were issued to [Wife] that had distributions from partnerships and S corporations," that totaled approximately four to five hundred thousand dollars. The distributions in the K1s would be available to the K1 owner, who is [Husband].

[…]

Adequate evidence was presented by [Wife] that [Husband] had access to sufficient funds to satisfy the parties' Agreement. In fact, [Husband] testified that he had the ability to access a million dollars in eight days. "But I just want to make the Court understand, as a citizen of this country, I'm going to try my best to pay off what I owe her. Now, if it's a million dollars, it makes it easier. If you would agree to that, I'll pay that this year." N.T., 12/23/2015, at 69. Consequently, [Husband] was found in willful contempt of the Agreement.

[Husband's] asserted numerous affirmative defenses to counter the finding of contempt, but he failed to meet his burden. While [Wife] did fail to comply with the parties' Agreement, the trial court found her noncompliance was not willful, and therefore there was no civil contempt. [Husband] also failed to provide any evidence that demonstrated how [Wife's] failure to refinance the properties impacted his ability to comply with the order. In fact, as stated above, [Husband] had access to sufficient funds to comply with the agreement, but willfully chose not to utilize the funds he had available to pay [Wife].

[Husband] asserted [Wife's] failure to refinance certain properties and her failure to make five mortgage payments negatively impacted his credit score and therefore negatively affected his ability to comply with the parties' Agreement and the court order. [Husband] only provided an Equifax Report Summary and a screen shot of his credit score for 2013 listing his credit score as 564. No information on prior years' credit scores were provided. There was therefore insufficient evidence that the mortgages

- 9 -

remaining in [Husband's] name or the alleged missed mortgage payments were the direct cause of [Husband's] low credit rating. In fact, the chief financial officer for a company owned almost solely by [Husband] testified that in 2010 or 2011 the company was denied loans based on [Husband]. Additionally, [Husband's] personal and business accountant testified that, "...when I came on ---when I was engaged, we noticed that there were all these tax liens that were happening with the IRS and in talking with [the CFO] I figured out why that was happening and that's because previous years' tax payments had not been made or certain payments had not been made. The IRS is a super creditor." N.T., 12/05/2017, at 22.

While [Husband's] credit score may have prevented him from getting loans, the low credit score cannot be attributed to [Wife] based on the evidence provided to the court. Again, as stated above, [Husband] did not need a personal loan; he had access to sufficient money to comply with the Agreement.

*See* Trial Court Opinion at 12-16 (some citations to the transcript omitted).

The court determined that Husband failed to meet his burden on this defense. The trial court accepted Wife's evidence that Husband had sufficient funds to pay Wife without securing a personal loan. But to the extent that Husband's poor credit prevented him from securing a loan, the trial court determined that Husband did not prove that his low credit score was Wife's fault. The record supports the court's determinations. These issues are without merit.

Husband's fifth and sixth issues involve a series of money transfers known as Mantis payments.[1]  Under the Paragraph 3 of the PSA, Husband owed Wife two separate lump sum payments – one for $150,000 and another for $200,000.  Husband acknowledged that he owed Wife the Mantis payments (totaling $350,000), but he asserted that he already paid it.  The trial court determined that he owed Wife a remaining balance of $105,010.  The court further awarded Wife interest on the balance at a rate of 4.5%, which was the rate the parties agreed to in another provision of their property settlement agreement.[2]  On appeal, Husband contends that that court erred in finding an unpaid balance due to Wife and in awarding interest on top of the outstanding balance, because the parties' PSA did not call for such a remedy.

First, as to Husband's testimony that he already paid Wife, the trial court found his testimony not credible:

---

[1] Husband was owed remittances from Stryker Corporation's sale agreement with Mantis LLC.  The sale agreement was for certain patents and patent applications. Husband was obligated to transfer to Wife $150,000 once the gross revenue from the sale of the patented products reached $20 million.  If it hit $30 million, Husband owed Wife another $200,000.  The parties acknowledged in their property settlement agreement that Wife's receipt of the Mantis payments was not guaranteed, but depended upon the success of the products.  The agreement provided a schedule, whereby Husband would update Wife every six months with a status report.  The triggering events came to pass, so Husband owed Wife $350,000.

[2] Under Paragraph 4(b) of the property settlement agreement, the parties agreed that Husband would transfer to Wife a sum of $1.5 million within five years of the agreement.  Any remaining balance would be subject to an annual interest rate of 4.5%.  Paragraph 3 (relating to the Mantis payments) was silent on whether an interest rate would be assessed if a balance was unpaid.

[Husband] testified on December 23, 2015 that he had made all the required Mantis payments, but lacked any supporting documents. On November 13, 2017 [Husband] again testified that he had made all the Mantis payments in full. [Husband] asserted that there was a "flurry of emails" between the parties around 2011, because [Wife] wanted her Mantis payment. He stated that he made installment payments and [Wife] would continue that payment by email and document the balance. No emails were produced to support [Husband's] claim. In contradiction of his previous testimony about a "flurry of emails" in 2011, [Husband] also testified that he received no emails from 2011 to 2014 regarding the Mantis payments because he had paid in full and "There were no more payments."

[Wife] testified credibly and supported her testimony with documentation that five payments were received by direct deposit from [Husband] toward fulfillment of the Mantis payments. Those payments started on December 9, 2008 and continued sporadically through December 19, 2013. The total of the payments was $244,990 (two hundred, forty-four thousand, nine hundred and ninety dollars). [Husband's] testimony was not credible as he made a bold, unsupported assertion that all the payments were made. His testimony was contradicted by [Wife's] documentation, which demonstrates that he made a direct deposit of $25,000 on May 25, 2012 and another direct deposit of $19,990 on December 19, 2013. Both payments were made well after 2011 when [Husband] claimed to have satisfied his Mantis payment obligation under Paragraph 3 of the parties' agreement.

[Wife] testified credibly and supported her testimony with documentation that five payments were received by direct deposit from [Husband] toward fulfillment of the Mantis payments. […] [Husband's] testimony was not credible as he made a bold, unsupported assertion that all the payments were made. His testimony was contradicted by [Wife's] documentation[.]

*See* Trial Court Opinion at 19-20 (citations to the transcript omitted).

We defer to the credibility determinations of the trial court with regard to the witnesses who appeared before it, as that court has had the opportunity to observe their demeanor. **See Habjan**, 73 A.3d at 644. The court's determination that Husband had a remaining Mantis payment balance was supported by the record.

Second, as to the trial court's award of interest on the outstanding Mantis payment, Husband contends that the trial court lacked the authority to issue such a remedy. He is mistaken.

Section 3502 of the Divorce Code affords the courts broad powers to enforce compliance with an order of equitable distribution or the terms of a private agreement as entered into between the parties. **See** 23 Pa.C.S.A. § 3502(e); **see also** 23 Pa.C.S.A. § 3105(a) ("A party to an agreement…may utilize a remedy or sanction set forth in [the Divorce Code] to enforce the agreement…."); **and see Miller v. Miller**, 983 A.2d 736, 743-744 (Pa. Super. 2009).

Section 3502(e) provides, *inter alia*:

> **(e) Powers of the court.**—If, at any time, a party has failed to comply with an order of equitable distribution, as provided for in this chapter or with the terms of an agreement as entered into between the parties, after hearing, the court may, in addition to any other remedy available under this part, in order to effect compliance with its order:
>
> \* \* \* \* \* \*
>
> (3) award interest on unpaid installments;

23 Pa.C.S.A. § 3502(e)(3)

- 13 -

*See Cunningham*, 182 A.3d 464, 474 (citing § 3502(e)(6)) (citation omitted).

Nothing in Paragraph 3 (relating to Mantis Payments) of the PSA precluded the court from issuing the remedies outlined in § 3502(e). The trial court's utilization of the interest rate the parties agreed to elsewhere in their settlement agreement was eminently reasonable.[3] Husband's fifth and sixth issues are meritless.

In his seventh claim, Husband takes issue with the court's authority to award interest on another outstanding payment owed to Wife. Pursuant to Paragraph 4(b) of the PSA, the parties agreed that Husband would transfer to Wife $1.5 million by August 2013, approximately five years from the PSA's date of execution. If Husband did not pay this sum within five years, the parties agreed that Husband would pay a simple annual interest rate of 4.5% on the unpaid *principal*.

At the trial, the parties stipulated that Husband owed an outstanding total balance of $1,023,673; this figure included both the principal and interest. The unpaid debt was overdue from November 13, 2017 until June 28, 2018 (or 227 days). Instead of applying the 4.5% interest only to the outstanding principal, as provided by the PSA, the trial court applied it to the entire outstanding balance. According to Husband, the court's erroneous calculation resulted in an overcharge of $15,000. *See* Husband's Brief at 60.

---

[3] Typically, in proceedings where the court awards interest, the applied rate is 6% percent per annum. *See* 41 P.S. § 202 ("Legal rate of interest).

Wife argues that even if the court miscalculated the remaining balance, § 3502(e)(3), **supra**, authorized the trial court to assess interest on unpaid installments. **See** Wife's Brief at 26-27. We disagree. As noted above, the Divorce Code authorizes courts to enforce settlement agreements as though they were court awards **except as provided to the contrary in the agreement. See** 23 Pa.C.S.A. § 3105(a) (emphasis added).[4] When the court inadvertently applied the interest rate to the entire balance, the court effectively sidestepped the PSA and its authority under § 3105. Husband's seventh claim has merit.

In his eighth claim, Husband argues the court abused its discretion in awarding counsel fees and costs relating to Wife's experts. The court awarded Wife counsel fees in the amount of $37,893 and costs, i.e. the cost of an expert witness, in the amount of $21,415.

As we have discussed in great detail, the trial court may be able to award interest on unpaid installments to effect compliance with a parties' settlement agreement. **See** 23 Pa.C.S.A. § 3502(e)(3). Likewise, the trial court may award counsel fees and costs. **See** § 3502(e)(7). "The imposition of counsel fees can serve as a sanction upon a finding of civil contempt." **Thomas**, 194 A.3d at 226 (citations omitted). "The purpose of awarding counsel fees in this

_____

[4] We note that Paragraph 3 of the PSA (regarding the Mantis payments) was silent on whether interest was owed on past due payments. However, in Paragraph 4(b) (regarding the $1.5 million transfer) the parties specifically agreed upon how interest would be calculated if Husband's transfer was past due: a 4.5% annual interest rate on the principal.

context is to reimburse an innocent litigant for the expenses the conduct of an opponent makes necessary, such as the cost of the contempt hearing, so it can be coercive and compensatory but it cannot be punitive." *Id.* (Citations, quotations, and footnote omitted). We review an award of contempt sanctions in the form of counsel fees for an abuse of discretion. *Id.*

Husband contends that the court's imposition of fees is not supported by the record. Specifically, he argues that here, unlike in *Thomas*, there was no detailed accounting of Wife's costs. Husband's reliance on *Thomas* is misplaced. *Thomas* did not require that a counsel fees award be calculated with a jeweler's precision. *Thomas* merely distinguished *Sutch v. Roxborough Memorial Hospital*, 142 A.3d 38 (Pa. Super. 2016), where the sanction imposed totaled over one million dollars in attorney's fees, allegedly incurred in an ordinary medical malpractice contingency fee case. We reversed because the fees were embellished. *See Thomas*, 194 A.3d at 227 (discussing *Sutch*, 142 A.3d at 79.).

Moreover, Husband's contention that the court's award was not based on a detailed accounting is disingenuous. In his brief, Husband recounted the court's hesitation about imposing an award because it had difficulty assessing the amount of fees Wife incurred. *See* Husband's Brief at 48. What Husband's Brief fails to acknowledge is *the very next line* from the transcript where the court explicitly left the record open to allow Wife to submit her detailed billing statements to the court. *See* N.T., 12/5/17, at 47. As directed, Wife

submitted billing statements. Not only was there an accounting of Wife's incurred expenses, this was not a typical contempt matter.

Although we can summarize the procedural history in two paragraphs, we observe that the extensive docket reflects arduous litigation. Husband's refusal to comply with the PSA caused Wife to spend years attempting to collect what Husband owed her. She filed multiple contempt and enforcement petitions. At the case's end, the court fashioned an award for fees and costs. That award is supported by the record and is not an abuse of the court's discretion. Husband's eight claim merits no relief.

In his final appellate matter, Husband challenges the deadline the court gave him to comply with its order. He surmises that the deadline is unreasonable, because there was no evidence of record to support the court's determination that he could comply with the order by the specific deadline. Husband cites no relevant legal authority to support his claim. As we discussed above, the court found Husband had the present ability to pay Wife. As such, the court would have likely been within its rights to order compliance immediately. Instead, it issued a three-month grace period. Husband's final claim is without merit.

In conclusion, we remand for the calculation of interest on the sum Husband owes Wife under Paragraph 4(b) of the parties' PSA; in all other respects, we affirm.

Order affirmed in part and vacated in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/19