J-A03024-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| EILEEN M. CULLISON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DONOVAN C. CULLISON | : | |
| | : | |
| Appellant | : | No. 991 WDA 2018 |

Appeal from the Order Dated June 18, 2018
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD 05-000104-004

BEFORE:   BOWES, J., SHOGAN, J., and STRASSBURGER*, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED SEPTEMBER 1, 2020**

Donovan C. Cullison ("Husband") appeals the June 18, 2018 order denying his exceptions to the Master's post-remand report and recommendation and awarding Eileen M. Cullison ("Wife") fifty percent of Husband's retirement fund as of May 2015, and counsel fees.  The June 18, 2018 order made final a July 14, 2016 order finding Husband in contempt, sustaining two of Wife's exceptions to the Master's recommendations regarding the equitable distribution of Husband's retirement fund, and remanding to the Master for a calculation of Wife's interest in Husband's retirement fund and her counsel fees.  After careful review, we affirm.

Husband and Wife were married in September 1985, separated in January 2005, and divorced in December 2008.  N.T., 12/9/15, at 84. Husband worked as a pilot for US Airways/American Airways ("US Air") from

_____
* Retired Senior Judge assigned to the Superior Court.

April 1983, during the marriage and after the separation and divorce, until his retirement in May 2015. *Id.* at 47. US Air entered bankruptcy in August 2002, which adversely affected its pilots' retirement plan. N.T., 1/23/07, at 103, 105–106; N.T., 3/1/07, at 119, 153–154. As part of its restructuring, US Air negotiated and entered multiple agreements with its pilots. Specifically, Letter of Agreement ("LOA") 85, known as Pilots' Defined Contribution Plan, terminated the existing US Air retirement benefits plan as of March 31, 2003, and created a defined contribution plan ("DC Plan"), which had an effective date of April 1, 2003, and was funded entirely by US Airways. LOA 85 at 2; Summary Plan Description, 1/1/05, at 1; N.T., 12/9/15, at 84–85, 90–94. The previous plan was a defined benefit plan known as the "Target Plan for Pilots of US Airways, Inc." ("Target Plan") and was discontinued during the US Airways bankruptcy. N.T., 12/9/15, at 94–95. If a pilot participated in the Target Plan, his or her prior account balance was maintained in a separate retirement account known as the "Target Benefit Account." Summary Plan Description, 1/1/05, at 1.

Subsequently, US Air and its pilots executed LOA 93, known as Transformation Plan, which addressed myriad issues, including changes to the DC Plan. LOA 93, Transformation Plan Term Sheet at 5; N.T., 3/1/07, at 158–159. The effective date of revisions contained in LOA 93 appears to be January 1, 2005, ten days before the parties' separation on January 11, 2005. Summary Plan Description, 1/1/05, at 1. Although the Target Plan was

weighted in favor of more experienced pilots, LOA 93 revised the DC Plan to provide contributions by US Air based on a pilot's monthly compensation, multiplied by a fixed contribution percentage of ten percent. Summary Plan Description, 1/1/05, at 5; N.T., 3/1/07, at 157; N.T., 3/20/09, at 84.

In March 2006, US Air provided pilots with a Summary Plan Description; it explained that the Target Plan was amended and revised, becoming the DC Plan, also known as the "Retirement Savings Plan for Pilots of US Airways, Inc." ("RS Plan"). Summary Plan Description, 1/1/05, at 1; N.T., 12/9/05, at 141–142. The Summary Plan Description summarized "the main provisions of the [RS Plan] as of January 1, 2005." Summary Plan Description, 1/1/05, at 1. Pursuant to the Summary Plan Description, US Air would make contributions on behalf of a pilot to a tax-deferred savings account, and the pilot would decide how to invest his or her account balance. *Id.* at 2; N.T., 12/16/05, at 63; N.T., 3/20/09, at 83. Fidelity Investments was custodian of the RS Plan. N.T., 3/1/07, at 81.

In January 2007, the parties entered stipulations regarding, *inter alia*, distribution of Husband's RS Plan benefits ("Stipulations"). Pursuant to the Stipulations, the parties agreed that:

> (3) Wife is entitled to receive whatever percentage the court determines to be equitable of **any and all benefits Husband receives** pursuant to the Transformation Plan of October 2004 (Letter of Agreement 93)[,] including but not limited to payments Husband receives from the lump sum payments on January 1, 2010 and January 1, 2011 and the profit sharing benefits. The parties agree that **all of the benefits Husband shall receive or has received under the Transformation Plan are marital**. . .

- 3 -

* * *

> (5) … the marital value of Husband's interest in the U.S. Airways Retirement Savings Plan . . . is $97,089 pretax as of 11/27/06. The total value of the [P]lan is [$]131,998 as of January 21, 2007. The parties agree that the Court will decide how to distribute this asset with the provisions as stated. The parties agree that **if the contribution formula is enhanced** to account for prior service **or if the benefit is enhanced** that reflects prior service, that a QDRO[1] or DRO[2] will be entered to pay ___ % (as the court determines for equitable distribution[)] of the marital value to Wife. . . .
>
> The parties agree also to QDRO or DRO **any other U.S. Air benefit** created after the date of separation that is based in any part on service during the marriage. Coverture to be calculated using the appropriate number of years of marriage during the credited years of service, divided by the credited years of service under the new plan.

Stipulations, 1/24/07, at ¶¶ 3, 5 (emphases supplied).

Following a three-day trial, the trial court disposed of the parties' equitable distribution claims on March 16, 2007. Incorporating paragraphs three and five of the Stipulations in its equitable distribution order ("ED Order"), the trial court awarded Wife fifty percent of the RS Plan. ED Order, 3/19/07, at ¶¶ 15, 16(a); **see also** Order, 7/14/16 (affirming that nature of the RS Plan as marital property subject to equal division was settled matter). Also, the trial court ordered that, "if the contribution formula is enhanced to account for prior service or if the benefit is enhanced that reflected prior

---

[1] Qualified domestic relations order

[2] Domestic relations order

service," the parties were to enter a QDRO or DRO to be paid at fifty percent to Husband and fifty percent to Wife. ED Order, 3/19/07, at ¶ 15. "Any other US Air benefit created after the date of separation that is based in any part on service during the marriage," would also be subject to a QDRO or DRO and based on the stipulated coverture fraction. *Id.* at ¶ 16(b).

The parties executed an amended RS Plan QDRO[3] in December 2008, identifying Wife as the alternate payee of the RS Plan with a fifty percent interest in the total vested balance of the RS Plan as of September 15, 2008. Amended Stipulated Qualified Domestic Relations Order—Retirement Savings Plan for Pilots of US Airways, Inc., 12/12/08, at ¶¶ 1b, 4. Through the amended RS Plan QDRO, Wife received a payment of $39,763.92, which represented half of the RS Plan's September 15, 2008 value of $79,527.84. N.T., 12/9/15, at 56–58, 139, Exhibits A, B.

Six years after executing the QDRO, Wife filed a petition to enforce the ED Order, claiming that she had not received all of the RS Plan benefits owed to her pursuant to that order; she also requested counsel fees. Petition for Enforcement, Contempt, Special Relief and Counsel Fees, 4/8/15, at ¶¶ 4, 10. Following a December 9, 2015 hearing, the Master agreed with Husband that Wife was not entitled to any more of the RS Plan benefits; nor was she entitled

---

[3] The parties executed multiple QDROs regarding various benefits earned by Husband: LOA 85 QDRO, 7/8/08; LOA 93 QDRO, 7/18/08; and Plan QDRO, 8/18/08. Docket Entries 194, 195, 197, and 212.

to counsel fees. Master's Report and Recommendation, 1/13/16, at 2, 4. Wife filed exceptions, and Husband filed a brief in opposition. Exceptions, 2/2/16; Brief in Opposition, 4/9/16. The trial court granted two of Wife's exceptions, finding the Master erred in denying Wife additional RS Plan benefits and counsel fees. Order, 7/14/16, at 1; Trial Court Opinion, 10/7/16, at 1. The trial court also found Husband in contempt of the ED Order and remanded to the Master for review of Wife's two exceptions. Order, 7/14/16, at 2; Trial Court Opinion, 10/7/16, at 1.

Following a January 22, 2018 remand hearing, the Master found that Husband "knowingly allowed the wasting of [the RS Plan] so as to defeat Wife's interest therein" and recommended that Wife receive fifty percent of the May 2015 balance of $448,799.22, rather than the July 2017 balance of $72,682.63, as well as $5,000 in counsel fees. Master's Report and Recommendation, 2/16/18, at 3–4. Husband filed exceptions, which the trial court denied. Exceptions, 3/9/18; Order, 6/21/18. This appeal followed. Husband and the trial court complied with Pa.R.A.P. 1925.

On appeal, Husband presents the following questions for our consideration:

1. Did the trial court err by finding that Husband waived certain exceptions by failing to set forth separate and specific objections?

2. Did the trial court err by failing to apply the coverture fraction to a retirement benefit earned after the parties' separation as specified in its March 16, 2007 order?

- 6 -

3. Did the trial court err by relying upon the January 2007 stipulations, the testimony taken at the 2007 equitable distribution trial, and its September 12, 2007 opinion, all of which pre-dated the March 16, 2007 order . . . of which [Husband] was found in contempt?

4. Did the trial court err by finding [Husband] in contempt of the March 16, 2007 order and awarding Wife counsel fees?

5. Did the trial court err by finding that [Husband] "knowingly" allowed the wasting of the retirement savings plan for pilots as to defeat [Wife's] interest therein?

6. Did the trial court err by awarding Wife fifty percent of the value of [Husband's] retirement savings plan for pilots as of May 2015 as opposed to the current value, plus or minus gains or losses?

Husband's Brief at 7–8 (full capitalization omitted).

In the context of Husband's first question, we address which issues he has properly preserved for review. According to the trial court, Husband has preserved only one issue: Whether the trial court erred in awarding Wife a fifty percent share of the May 2015 RS Plan balance. Trial Court Opinion, 9/5/18, at 6–7. The trial court found that Husband waived all other issues by simply referring to arguments he raised in his Brief in Opposition to Wife's Exceptions in lieu of setting forth separate, individual exceptions. *Id.* at 7.

Husband argues that, given the procedural history of this case, he did preserve the substantive issues raised on appeal. According to Husband, he "could not have filed Exceptions to the initial Master's Report and Recommendation issued in February of 2016 because the Master ruled in favor of Husband." Husband's Brief at 38. Husband explains that, when Wife filed

- 7 -

exceptions on February 2, 2016, to the Master's January 13, 2016 report and recommendation, he filed a brief in opposition, in which he preserved the first five substantive issues raised in this appeal. *Id.* at 36 (citing Brief in Opposition, 4/9/16). Husband further explains that, after the trial court granted two of Wife's exceptions and remanded for consideration by the Master, he "attempted to appeal the case[,]" but withdrew it because the trial court deemed it interlocutory. *Id.* at 38–39. Therefore, Husband submits that his "arguments had already been considered by the [t]rial [c]ourt in the first round of Exceptions[, *i.e.*, Wife's February 2, 2016 exceptions,] and were not before the [t]rial [c]ourt in the second round of Exceptions, which only pertained to the remand of the first round of Exceptions." *Id.* at 37. Relying on the trial court's pre-remand opinion of October 7, 2016, Husband argues that the trial court:

> was aware of the issues that Husband intended to raise as it specifically listed those issues in its Opinion. The parties proceeded to the remand hearing and Husband subsequently filed Exceptions to that remand, preserving his arguments until a final Order was entered on June 18, 2018.

*Id.* at 39.

To preserve an issue for appeal, a party must file a timely exception to the Master's Report pursuant to Pa.R.C.P. 1920.55–2(b). The rule provides:

> Within twenty days of the date of receipt or the date of mailing of the master's report and recommendation, whichever occurs first, any party may file exceptions **to the report or any part thereof, to rulings on objections to evidence, to statements or findings of fact, to conclusions of law, or to any other matters occurring during the hearing.** Each exception shall

- 8 -

set forth a separate objection precisely and without discussion. Matters not covered by exceptions are deemed waived unless, prior to entry of the final decree, leave is granted to file exceptions raising those matters.

Pa.R.C.P. 1920.55–2(b) (emphasis supplied). The purpose of exceptions in a judicial proceeding is to point out mistakes of fact or law so that the trial judge has an opportunity to correct them before an appeal is lodged. *In re Borough of Churchill*, 575 A.2d 550, 555 (Pa. 1990).

Here, after Wife filed exceptions to the Master's first report and recommendation, Husband filed an opposing brief. Therein, he stated his position on whether: (1) Wife was entitled to receive retirement benefits Husband acquired after separation; (2) Wife was entitled to a portion of Husband's profit sharing distributions; (3) Husband was in contempt; (4) Wife was required to pay a portion of the parties' 2004 taxes; (5) Wife was required to reimburse Husband for taxes due from 2004; and (6) Wife was entitled to counsel fees. Brief in Opposition, 4/9/16, at unnumbered 9–16. After the trial court granted Wife's first and sixth exceptions, Husband filed an appeal. In response, the trial court filed an opinion, addressing all of Husband's arguments. Opinion, 10/7/16, at 4–10. The trial court opined, however, that the appeal was interlocutory. *Id.* at 5–6. Husband agreed, withdrew his appeal, and his issues did not reach this Court. The trial court remanded Wife's two exceptions to the Master for review. Order, 5/30/17. The Master found Husband liable to Wife for additional RS Plan benefits. Report and Recommendation, 2/16/18, at 3–4. Husband filed exceptions to the Master's

post-remand recommendation, and raised his earlier issues by incorporation, without listing them specifically. Exceptions, 3/9/18, at ¶¶ 1, 2.

Based on the foregoing, we conclude that the trial court had the opportunity to address Husband's allegations of error and filed an opinion addressing the issues Husband now raises on appeal. Trial Court Opinion, 10/7/16, at 4–10; **Borough of Churchill**, 575 A.2d at 555. Because the purpose of exceptions has been met, we choose to overlook Husband's technical error in not spelling out the exceptions a second time. Thus, we reject the trial court's finding of waiver, and we will address the remaining questions presented.

Husband's second issue challenges the trial court's equitable distribution of Husband's RS Plan benefits. We review a challenge to the trial court's equitable distribution scheme for an abuse of discretion. **Brubaker v. Brubaker**, 201 A.3d 180, 184 (Pa. Super. 2018) (citation omitted). Moreover:

> "[w]e do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence." **Id.** We will not find an abuse of discretion "unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." **Carney v. Carney**, 167 A.3d 127, 131 (Pa. Super. 2017). When reviewing an award of equitable distribution, "we measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." **Hayward v. Hayward**, 868 A.2d 554, 558 (Pa. Super. 2005).

When determining the propriety of an equitable distribution award, this Court must consider the distribution scheme as a whole. ***Mundy v. Mundy***, 151 A.3d 230, 236 (Pa. Super. 2016). "We do not evaluate the propriety of the distribution order upon our agreement with the court's actions nor do we find a basis for reversal in the court's application of a single factor. Rather, we look at the distribution as a whole in light of the court's overall application of the 23 Pa.C.S. § 3502(a) factors for consideration in awarding equitable distribution. If we fail to find an abuse of discretion, the order must stand." ***Harvey v. Harvey***, 167 A.3d 6, 17 (Pa. Super. 2017) (citation and internal brackets omitted). Finally, "it is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence." ***Brubaker***, 201 A.3d at 184 (citation omitted).

***Hess v. Hess***, 212 A.3d 520, 523 (Pa. Super. 2019).

Specifically, Husband argues that the trial court erred in awarding Wife fifty percent of his RS Plan benefits. According to Husband, the RS Plan benefits were post-separation, non-marital retirement assets to which the coverture fraction should have been applied as specified in the ED Order. Husband's Brief at 40–41. In Husband's view, the trial court mischaracterized the RS Plan benefits as "a 'chunk' of retirement benefits that [Husband] earned during the marriage, but US Airways could not properly give him . . . on the account of the bankruptcy." ***Id.*** at 42 (citing Trial Court Opinion, 10/7/16, at 7). Husband argues, "The true error in the trial court's finding is in its determination that the retirement benefits Husband earned post-separation were entirely attributable to work performed during the marriage and marital property." ***Id.*** at 46.

- 11 -

Wife counters that division of the RS Plan was addressed in paragraph 16(a) of the ED Order. Wife's Brief at 13. That paragraph, Wife argues, entitled her to one-half of any funds attributable to the RS Plan, including the benefits at issue, which the trial court identified as marital. *Id.* at 14, 16–17. According to Wife, the "coverture fraction was only to be applied to any *other* benefits, those benefits anticipated under Paragraph 16(b)" of the ED Order. *Id.* at 14.

Upon thorough review of the entire testimonial and documentary record, we conclude that Husband's coverture-based position is not sustainable. The ED Order arose out of the Stipulations, wherein Husband agreed that:

> (3) Wife is entitled to receive whatever percentage the court determines to be equitable of **any and all benefits Husband receives pursuant to the Transformation Plan of October 2004 (Letter of Agreement 93)**. . . . The parties agree that **all of the benefits Husband shall receive or has received under the Transformation Plan are marital**.

Stipulations, 1/24/07, at ¶ 3 (emphases supplied). Pursuant to the Stipulations and the ED Order, the coverture fraction would apply in the event US Air created any other benefit after the date of separation that was based in any part on Husband's service during the marriage. Stipulations, 1/24/07, at 5; ED Order, 3/29/07, at ¶ 16(b). The record contains no evidence that US Air created such a benefit, and the RS Plan was not a benefit created after the date of separation; rather, it was the revised continuation on the DC Plan. LOA 85, LOA 93, Summary Plan Description, 1/1/05, at 1.

Moreover, the ED Order language is clear and unambiguous: Wife is entitled to fifty percent of the RS Plan benefits, and the coverture fraction applies to any other benefits. ED Order, 3/19/07, at ¶¶ 15, 16(a), and 16(b). Significantly, on multiple occasions during this protracted litigation, Husband affirmed—or, at least, he did not object—that Wife was entitled to fifty percent of the RS Plan benefits. N.T., 6/4/08, at 187, 205; N.T., 9/26/11, at 319–320; N.T., 1/22/07, at 4–7, 8, 34–35; N.T., 3/1/07, at 43, 82, 84, 87; N.T., 12/9/15, at 52–53, Exhibit 2; *see also* Consent Order, 6/18/08, at ¶ 1 (Husband consents to Wife receiving fifty percent of "his retirement accounts . . . and benefits he received and will receive through his . . . Retirement Savings Plan, the Transformation Plan [LOA] 93 and the Transformation Plan [LOA] 85 until such time as he retires."). Moreover, although Husband filed a notice of appeal from the ED Order, challenging, *inter alia*, the award of fifty percent of the RS Plan to Wife, he withdrew the appeal. Pa.R.A.P. 1925(b) Statement of Errors, 5/24/07; Superior Court Order, 12/29/07. Thus, he cannot be heard now to challenge the award of fifty percent of the RS Plan benefits to Wife.

Because the ED Order demonstrates that the coverture fraction did not apply to the RS Plan benefits at issue, we discern no abuse of the trial court's discretion in refusing to apply it. Husband's contrary claim fails.

Husband's third issue challenges the trial court's reliance on documents and testimony outside the scope of the ED Order "to expand the scope of the

assets to which Wife was entitled." Husband's Brief at 52. Specifically, Husband argues that the trial court "abused its discretion by relying upon the January 24, 2007 Stipulations, trial testimony heard at the equitable distribution hearing, . . . and its September 12, 2007 Opinion . . . ." *Id.* at 50.

According to Husband, the trial court should not have relied on the Stipulations because their application was limited to the QDRO provision of the ED Order; the QDRO pertained only to "any other US Air benefit created after the date of separation that is based in any part on service during the marriage." Husband's Brief at 52. Husband asserts that the trial court relied on the challenged documents and testimony in an attempt to obtain the result it desired rather than the result that followed the plain language of the [ED] Order." *Id.* at 53. Husband concludes that the trial court's use of the challenged documents and testimony to interpret its unambiguous ED Order violates Pennsylvania law "in that assets earned after the parties' separation are not deemed marital property." *Id.* at 55.

In response, Wife argues that, although the trial court mentioned the Stipulations "and other information in its [ED] Order, the court did not <u>rely</u> on [them] in order to rule in favor of Wife." Wife's Brief at 17 (emphasis in original). According to Wife, the trial court "did not <u>need</u> the [Stipulations] or trial testimony in order to reach the conclusion it did, it simply referred to that

information to remind Husband of all that led to the [ED Order.]" *Id.* at 18–

19 (emphasis in original).

The trial court addressed Husband's challenge to its record references

as follows:

> This [c]ourt essentially divided equally the parties' assets. *See generally* ED Order, dated March 16, [2007]. Thus, in order to effectuate the 50-50 scheme, the [c]ourt, and per the parties['] stipulation, also equally divided [the RS Plan] benefits (i.e. Paragraph 16(a) benefits).
>
> *   *   *
>
> Husband contends that the [c]ourt's reliance on part of the case's record amounts to an error. Husband requested this [c]ourt deny Wife's enforcement action but argues that this [c]ourt must forget the case history, specifically the rationale behind it own order and trial court opinion.
>
> *   *   *
>
> [I]t is worth noting that the Family Division of the Court of Common Pleas in Allegheny County operates on a "One Judge/One Family" system, wherein only one judge hears a family's case. The judge of record in this [case] has been the only judge of record for over a decade, after the previous judge of record transferred to Civil Division. The current judge of record presided over the equitable distribution, its stipulations, its trial and authored the ED order and corresponding opinion. . . .
>
> In this case, Husband would have this [c]ourt proceed blindly, forbidden from looking to the history. The [c]ourt does not find use for irrelevant or even tangentially relevant docket entries, nor is interested in revisiting those rulings cited in Wife's Exceptions brief that are particularly unfavorable to Husband. Rather, this [c]ourt, in the interest of promoting stability and continuity within the case merely revised that specific point in the case's previous litigation that has seemingly [been] the source of the present conflict. Husband would have this [c]ourt pretend it did not previously address these matters.

Trial Court Opinion, 10/7/16, at 2–3, 9–10 (internal citations omitted).

Upon review, we discern no abuse of discretion or error of law. The Stipulations and equitable distribution hearing testimony resulted in the ED Order. The trial court's September 12, 2007 opinion addressed Husband's thirty-five allegations of error related to the ED Order, including a challenge to the trial court's conclusion that Wife was entitled to fifty percent of the RS Plan benefits:

> Husband also contends that the [c]ourt erred in dividing the retirement plan and any benefits under the so-called transformation plan equally between the parties. However, Husband agreed to this division, and cannot now be heard to dispute it. *See* T.T., Vol. III, at 83–84 (where Husband's counsel stated: "the parties agree to share it, in proportion to what you create as an equitable distribution scheme.").

Trial Court Opinion, 9/12/07, at 19. As stated earlier, Husband filed a notice of appeal from the ED Order then discontinued it; thus, the award to Wife is unassailable at this point. Finally, we would question the reasoning of any trial court that did not consider the history of the case in formulating its current decision. Husband's third issue does not warrant relief.

In his fourth issue, Husband complains that the trial court erred by finding him in contempt of the ED Order and awarding Wife counsel fees "because he had failed to provide Wife [with one-]half of all of the retirement benefits he had received based on his post-separation work." Husband's Brief at 56. Regarding contempt orders, our scope of review is very narrow, and we place great reliance on the court's discretion. **Thomas v. Thomas**, 194

A.3d 220, 225 (Pa. Super. 2018) (citation omitted). The trial court abuses its discretion if it misapplies the law or exercises its discretion in a manner lacking reason. *Harcar v. Harcar*, 982 A.2d 1230, 1234 (Pa. Super. 2009). Each court is the exclusive judge of contempts against its process. The contempt power is essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute. *Habjan v. Habjan*, 73 A.3d 630, 637 (Pa. Super. 2013). Absent an error of law or an abuse of discretion, we will not disrupt a finding of civil contempt if the record supports the court's findings. *Thomas*, 194 A.3d at 225 (citation omitted).

Generally, in a civil contempt proceeding, the burden of proof rests with the complaining party to demonstrate that the defendant is noncompliant with a court order. *MacDougall v. MacDougall*, 49 A.3d 890, 892 (Pa. Super. 2012).

> To sustain a finding of civil contempt, the complainant must prove, by a preponderance of the evidence, that: (1) the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) the act constituting the contemnor's violation was volitional; and (3) the contemnor acted with wrongful intent.

*Id.* Nevertheless, "a mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt." *Habjan*, 73 A.3d at 637. "If the alleged contemnor is unable to perform and has, in good faith, attempted to comply with the court order, then contempt is not proven." *Cunningham v. Cunningham*, 182 A.3d 464, 471 (Pa. Super. 2018).

According to Husband, because he provided Wife with her share of the retirement benefits based on "work performed during the marriage" *via* the QDRO, he "justifiably believed he had complied with the [ED] Order." Husband's Brief at 56–57. In support of his position, Husband submits the Master's report and recommendation following the contempt hearing on December 9, 2015:

> The [M]aster finds that Husband has *not been in contempt*. Both his attorney and he have repeatedly attempted to address all of Wife's concerns in a timely fashion but did not receive reciprocal cooperation from Wife or her counsel. Wife's counsel represented her at the time the [QDROs] were prepared and submitted and the docket clearly [reflects] that. Why this remains a problem for Wife appears to be that she has the unrealistic expectation that she is entitled to a share of Husband's post-separation contributions to his pension. This is not the law in Pennsylvania.
>
> Wife has incurred counsel fees of over $34,000 in pursuing matters which were resolved in 2008. She has received her 401(k) award, is receiving her share of the US Airways pension . . . and knew that the Target benefit Plan had replaced the Savings Plan. . . .

Husband's Brief at 58–59 (citing Master's Report and Recommendation, 1/13/16, at 3–4). *See also* N.T., 9/26/11, at 427 (Husband did not split lump sum payment with Wife because he believed QDRO covered her fifty percent share). The trial court rejected the Master's finding of no contempt. Order, 7/15/16, at 1; Trial Court Opinion, 10/7/16, at 3–4.

Wife counters that Husband had notice of his obligation to divide the RS Plan benefits equally with Wife under the ED Order; his failure to comply with the ED Order was volitional because his belief that he had complied with the

ED Order was not justified; the ED Order was definite, clear, and specific. Wife's Brief at 19–20. Thus, Wife asserts, the trial court appropriately held Husband in contempt. *Id.* at 20.

The trial court justified its contempt finding with the following analysis:

This [c]ourt departed from the Master's recommendation and found Husband to be in contempt for failing to comply with the 2007 ED Order. Litigation on this narrow question of benefits has lasted unnecessarily for well over a year. Had this been a contention of first impression, so as to speak, the [c]ourt would not characterize Husband's noncompliance with such disapproval, but the [c]ourt previously ruled (and wrote) on this matter. The benefits question was not as complex an issue as Husband would make it out to be. The [c]ourt opines that this issue was not one of ambiguity, ripe for putting forth a creative argument. Rather, Husband's inaction simply meant he failed to comply with this [c]ourt's ED Order. "If, at any time, a party has failed to comply with an order of equitable distribution. . . the court may. . .in order to effectuate compliance with its order: award counsel fees and/or . . . find the party in contempt." 23 Pa.C.S.A. § 3502(e)(7);(9).

Trial Court Opinion, 10/7/16, at 6.

Here, Wife has demonstrated all three elements for contempt. The relevant provisions of the ED Order, directing Husband to divide the RS Plan benefits equally with Wife, were clear, definite, and specific. ED Order, 3/24/07, at ¶¶ 15, 16(a), and 16(b). Husband does not argue otherwise, and he does not deny that he had notice of the ED Order. Moreover, Husband stipulated to Wife's receipt of whatever percentage of the RS Plan benefits the trial court awarded—ultimately, fifty percent—and did not appeal the ED Order. Stipulations, 1/24/07, at ¶¶ 3, 5; Consent Order, 6/18/08, at ¶ 1. If

- 19 -

Husband was confused about the retirement provisions of the ED Order, he could have sought clarification from the trial court.

As for Husband's intent, the record reveals that within two months of the trial court's April 17, 2015 order enjoining Husband from transferring any portions of his various retirement accounts, Husband "transferred the entire balance of the [RS Plan] of just over $440,000 into a rollover IRA account." Trial Court Opinion, 9/5/18, at 3; N.T., 12/09/05, at 82–83, 136, 240-241. From the time of the rollover until the remand hearing, the RS Plan account "had lost more than [one-]half its value, dropping more than $200,000 without any action by Husband." Trial Court Opinion, 9/5/18, at 4; N.T., 12/9/15, at 155. Husband admitted that the account, which was "self-directed," "tanked" and that he did nothing about it. N.T., 12/9/15, at 155–156. Thus, Husband's failure to pay one-half of his RS Plan benefits to Wife was volitional, and he acted with wrongful intent. Accordingly, we reject Husband's request for relief on the finding of contempt.

In his fifth issue, Husband challenges the Master's recommendation and the trial court's finding that he knowingly allowed the wasting of the RS Plan. Husband's Brief at 60–65. We repeat: "[I]t is within the province of the [fact finder] to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence." **Hess**, 212 A.3d at 523 *2 (citation omitted).

Here, the trial court accepted the Master's factual findings regarding

Husband's handling of the RS Plan investments:

As of May 7, 2015, not long after the filing of Wife's contempt petition, the account had a value of $448,799.22. Most of the account was invested in stock with a company called Sino Agro. [N.T., 1/22/18,] at 78. Once the contempt litigation was underway, the account, which was exclusively under Husband's control, began a steady and substantial decline—without any action by Husband to change the investment strategy—such that, two years later and with the same litigation still ongoing, the balance was down to only $72,682.63 as of June 30, 2017. Master's Report[, 2/16/18,] at 3; [N.T., 1/22/18,] at 33.

In more detail, the Master noted that, on May 7, 2015, the value was $448,799.22. Master's Report at 3. . . . [On June 30, 2015, the value was reduced to $423,373.47, a loss of $25,425.75. Additional losses occurred in July, August and September]. Id. . . . By the end of 2015, the balance dropped by an additional $108,464.12, for a loss of more than $200,000. Id. Throughout 2016, Husband continued to do nothing while the account lost another $181,411.42, until ultimately, by June 30, 2017, the account was down to $72,682.63. Id.

Trial Court Opinion, 9/5/18, at 4–5 (citing Master's Report and

Recommendation, 2/16/18, at 3).

On appeal, Husband maintains that "Fidelity prohibited [him] from

making changes and[,] therefore, Husband did not knowingly waste the [RS]

Plan." Husband's Brief at 60. Additionally, Husband blames the trial court's

April 17, 2015 order, filed in response to Wife's request to prevent Husband

from withdrawing funds from the RS Plan as he was turning sixty-five, for his

not making changes to the RS Plan. *Id.* at 61. As further justification for his

position, Husband asserts that he "attempted to submit an [o]rder to the

[t]rial [c]ourt at the oral argument on the first round of [e]xceptions that

- 21 -

would 'unfreeze' the [RS Plan] and permit Husband to trade the depleting stock. However, the [t]rial [c]ourt declined to execute said [o]rder." *Id.* at 63. Moreover, Husband claims that he "had no incentive to cause the decrease in value of the account because he believed that all of the money in the RS Plan belonged to him alone." *Id.*

The Master did not believe Husband's explanations regarding devaluation of the RS Plan account:

> According to the 4/17/15 Order of Court:
>
>> Defendant Husband was enjoined from withdrawing, liquidating, transferring, gifting, encumbering, or otherwise disposing of any portion of his various accounts through US Airways, including but not limited to his US Airways Savings Plan Account, his 401(k) Plan, as well as any other retirement or other benefits of any kind that Husband has received from US Airways.
>
> There was no language in that Order restricting Husband's ability to sell or trade stocks within that Plan. Even if he misunderstood it, when he saw the value of this Plan dropping precipitously quarter after quarter, neither he, nor his counsel, if she was so informed, had sought permission for the Court via a simple Motion or Petition to take such action as necessary to stem the floodgates.
>
> * * *
>
> The Master is forced to conclude that for over 2 years Husband intentionally did nothing. That he knowingly allowed the wasting of this valuable asset [the RS Plan] so as to defeat Wife's interest therein. In fact, according to the statements contained in Exhibit 5, Husband knew he could buy and sell shares. He had bought the Sino Agro Food Inc. shares on 6/12/15, almost 2 months after the "freeze order" went into effect. He continued to buy Sino Agro Food stock in July and August 2015. In the September 2015 statement it clearly shows that Sino Argo Food shares LOST

$43,816.90 in just that month, but Husband, who was not a newcomer to the stock market, again took no action to diversify his portfolio.

Master's Report and Recommendation, 2/16/18, at 2–3 (emphases omitted).

The trial court agreed with the Master's credibility assessment and finding that Husband disposed of the contents of the RS Plan account by wasting them:

> Contrary to Husband's position, nothing in the plain language of the [April 15, 2015] Order prevented Husband from engaging in trading within the account, and . . . Husband testified that his purpose in rolling the money into this account was to avoid a blackout and expand his investment options. See [N.T., 1/22/18, at 85–86.] Moreover, given the extensive [c]ourt action in this case, if Husband believed that he was prevented from trading or taking action to preserve the account by selling a clearly failing stock in an otherwise positive market, he certainly knew how to come to [c]ourt to explain his predicament and seek an order explicitly permitting trading. Similarly, if as Husband claims, Fidelity refused to allow him to trade, Husband once again could have come to [c]ourt for an Order to the contrary for Fidelity. He did not. Husband's position that his hands were inalterably tied even as the fund plummeted and plummeted is simply not credible.[8]

> > [8] In his argument, Husband argues that his action in obtaining a consent order back in August of 2015 to withdraw some funds from the Fidelity account, which he then did not do, shows that he did not intend to waste the asset. However, there is nothing in the record about the reason for the request or his subsequent inaction. To this [c]ourt, the consent order demonstrates Husband'[s] knowledge of how to approach the [c]ourt if changes needed to be made regarding this account. See Consent Order of Court, entered Aug. 6, 2015.

> > Finally, Husband argues that he would have had no incentive—such as the acrimony that has infused this decade of litigation—to allow the wasting of the [RS] Plan to spite Wife

- 23 -

because he believed that the [RS] Plan's contents were non-marital and, therefore, all for him. See Husband's Exceptions Br. at 4–5. On credibility, this contention fares equally poorly in light of the [Stipulations] filed with this [c]ourt many years ago, in which Husband put his own handwritten signature to the following statement: "The parties agree that all of the benefits Husband shall receive or has received under the [RS] Plan are marital." Stipulations, Jan. 22, 2007, filed Jan. 24, 2007. The factfinder was within its discretion to reject Husband's evidence and credibility on this matter. In any event, Husband's arguments on whether the [RS] Plan was a marital asset have been previously and extensively litigated, rejected, and settled.

Trial Court Opinion, 9/5/18, at 10–11 (footnote and some citations omitted).

Upon review, we discern no basis for disturbing the trial court's determination that Husband knowingly wasted the RS Plan account. The trial court found, and the record confirms, that:

[a]s of May 7, 2015, not long after the filing of Wife's contempt petition, the [Plan] had a value of $448,799.22. Most of the account was invested in stock with a company called Sino Agro. [N.T., 1/22/18, at 78.] Once the contempt litigation was underway, the [Plan], which was exclusively under Husband's control, began a steady and substantial decline—without any action by Husband to change the investment strategy—such that, two years later and with the same litigation still ongoing, the balance was down to only $72,682.63 as of June 30, 2017. Master's Report at 3; [N.T., 1/22/18,] at 33.

* * *

On the current matter, it also appeared that Husband possessed but did not turn over to Wife communication from Fidelity regarding Husband's ability to interact with the account absent Court permission. See [N.T., 1/22/18,] at 80, 84. However, in a separate document from May 26, 2015, which was sent to both parties directly, Fidelity indicated its unwillingness to allow withdrawals without court intervention, but significantly, did allow that Husband would "remain eligible to direct the investment of future contributions and existing balances." Id. at 83. From its face, this document gives the understanding that Wife plainly had:

- 24 -

that Husband could direct investments within the account if there were a need.  Indeed, Husband also testified that the very reason he rolled the account over with Fidelity was because there was a so-called blackout period coming due to an airline merger that would have shut out all account activity.  Id. at 85–86.  Therefore, Husband explained on the stand, the account was rolled over so that "I wouldn't be restricted to not doing anything during the blackout period, plus the investment choices would be broadened.  I wouldn't be restricted to what the investment choices were."  Id. at 86.  Nonetheless, Husband admitted to a long lapse in any communication with Fidelity:  "I just let it be while I've waited for this litigation to finish up."  Id.  As both parties are aware, litigation in this divorce is contentious and does not tend to finish up promptly, as evidenced by the fact that the issue now before the [trial c]ourt has been in litigation for three years.

Trial Court Opinion, 9/5/18, at 4–6 (internal brackets and footnotes omitted).

Moreover, as stated above, Husband admitted that the account, which was "self-directed," "tanked" and that he did nothing about it.  N.T., 12/9/15, at 155–156.  In light of Husband's own testimony, his self-serving arguments did not persuade the trial court, and they do not persuade us.  Accordingly, we decline to grant relief on this issue.

Lastly, Husband challenges the trial court's ruling that, because Husband wasted the RS Plan account, Wife was entitled to one-half the value of the RS Plan as of May 2015, which was $448,799.22, rather than one-half the value of the RS Plan as of June 2017, which was $72,682.63.  Husband's Brief at 65–66.  Husband argues that Pennsylvania law favors using the date of distribution for the valuing of an asset because "volatile market conditions [have] an effect on valuing assets and therefore, it is more just to value the asset as of the date of distribution."  Husband's Brief at 67 (citing **Sutliff v.**

***Sutliff***, 543 A.2d 534, 537 (Pa. 1988)).  As a result of the trial court's ruling, Husband submits, he will be left with zero retirement funds at the age of sixty-five, and he will have "to obtain a loan in order to secure the funds to pay Wife the difference owed." ***Id.*** at 68.  Husband considers this result "unjust" and "not supported by Pennsylvania law." ***Id.*** at 70.

"In determining the value of marital assets, a court must choose a date of valuation which best works economic justice between the parties.  The same date need not be used for all assets." ***Smith v. Smith***, 904 A.2d 15, 18 (Pa. Super. 2006) (citations omitted).  We observed in ***Smith*** our Supreme Court's recognition in ***Sutliff v. Sutliff***, 543 A.2d 534 (Pa. 1988), that the date of distribution should generally be utilized for determining the value of a marital asset as that date is the one that will most likely achieve economic justice. The ***Smith*** Court further observed, however, that there are limited circumstances when a different valuation date may be utilized to achieve economic justice. ***Smith***, 904 A.2d at 19.  Those circumstances include when one spouse has consumed or disposed of the asset in question or if conditions render it difficult to ascertain the date-of-distribution value. ***Id.***

Because Husband wasted the RS Plan account, the Master agreed with Wife that a non-distribution valuation date was appropriate:

> Wife's position is that if Husband had transferred her 50% of the [RS] Plan in May 2015, she would have received almost $224,400 which she would have been able to invest as she saw fit.  The Master agrees that Wife should have received her share, if not in May 2015, by no later than September 2015 when it was clear that Sino Agro Food was not a good investment.

Master's Report and Recommendation, 2/16/18, at 2–3 (emphases omitted).

Affirming the Master's credibility assessment that Husband disposed of the RS Plan assets by wasting them, the trial court supported the Master's valuation date: "[T]he circumstances of this case remove it from the 'usual case' described in Sutliff, 543 A.2d 534, 536, and that valuation at an earlier date is permissible and just." Trial Court Opinion, 9/5/18, at 10. Consequently, the trial court rejected Husband's reliance on case law utilizing the date-of-distribution valuation method. *Id.* at 9–10 (distinguishing **Sutliff** and **Fexa v. Fexa**, 578 A.2d 1314 (Pa. Super. 1990)).

Upon review of the record, we find support therein for the trial court's factual finding that, despite the ability to do so, Husband did nothing to protect the RS Plan assets and allowed its value to plummet over the course of two years. N.T., 12/9/15, at 155–156; N.T., 1/22/18, at 47. Husband's claim that he attempted to obtain a court order "unfreezing" the RS Plan during oral argument of Wife's exceptions is belied by the record. N.T., 1/22/18, at 101–104. Husband's reliance on **Sutliff** and **Fexa** is misplaced. The former case focused on market volatility, which was not a contributing factor in this case. **Sutliff**, 543 A.2d 534. The latter involved investment advice from a plan administrator, which resulted in devaluation of the account. **Fexa**, 578 A.2d 1314. In contrast, Husband was in control of the RS Plan account, and his management decision caused its devaluation. Thus, we discern no error in the trial court's conclusion that the circumstances of this case warrant

valuation at an earlier date in order to best work economic justice between the parties. **Smith**, 904 A.2d at 18.

Order affirmed.

Judge Bowes joins this Memorandum.

Judge Strassburger files a Concurring & Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/1/2020