J-A22041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LINDSEY WALSH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEFFERY BROWN | : | No. 593 WDA 2024 |

Appeal from the Order Entered April 23, 2024
In the Court of Common Pleas of Erie County Civil Division at No(s):
11195-2021

BEFORE:  MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                          **FILED: October 25, 2024**

Appellant, Lindsey Walsh ("Mother"), appeals from the order entered in the Erie County Court of Common Pleas, which granted the petition for contempt filed by Appellee, Jeffery Brown ("Father").  We affirm.

The relevant facts and procedural history of this appeal are as follows. The parties married in September 2013.  The parties have two minor children ("Children").  S.B. was born in December 2014, and T.B. was born in February 2017.  On June 8, 2021, Mother filed a divorce complaint.  Mother filed a separate custody complaint on August 5, 2021.

The trial court set forth the remaining procedural history of this appeal in its opinion as follows:

> In September of [2021], the parties agreed to a Temporary Custody Order regarding their two children pending a custody trial.  The Temporary Order provided that "[o]n non-school/daycare days, custody exchanges shall occur at

10:00 a.m. at the Corry, Pennsylvania Walmart." In January of 2022, [Father] filed a contempt petition against [Mother] claiming that [M]other violated the Temporary Order by failing to transfer physical custody of the children at the agreed upon time. The undersigned first became involved in this case in February of 2022, while presiding over the contempt hearing. This court ultimately denied Father's petition for contempt, finding "the terms and conditions of the September 29, 2021 Custody Order [were] not sufficiently clear to support a violation, nor [did] the evidence presented at the hearing rise to the level of willful conduct committed with wrongful intent."

[Another jurist] presided over the custody trial, which spanned the course of two days in September and October of 2022. In the resulting Custody Order, [the court] directed that "[u]nless mutually agreed otherwise, the parties shall receive the Children for their periods of partial physical custody directly from school or the school bus. When school is not in session, custody exchanges shall occur at a reasonable half-way point between Corry and Titusville." On the heels of the custody trial, in December of 2022, [M]other brought her own contempt petition against [F]ather, again centering around the exchange issue. But [M]other eventually withdrew her petition, with the parties instead opting to attempt mediation of the reoccurring exchange problem. That mediation apparently proved unsuccessful.

In August of 2023, [M]other filed a modification petition. The parties agreed to have a hearing officer take evidence on the request. The sole issue submitted for his consideration was transportation and exchange of physical custody. At the proceeding before the Hearing Officer, [M]other testified that although her own mother had assisted with transportation of the children in the past, her mother was no longer willing to do so, and as such, she requested that the receiving parent be responsible for picking up and transporting the children. By contrast, [F]ather proposed that exchanges occur at the Methodist Church in Spartansburg, which was approximately 10 minutes from [F]ather's residence and 20 minutes from [M]other's residence. At the conclusion of the proceeding, the Hearing Officer recommended that "[t]he parents shall

exchange physical custody of the children at the Methodist Church in Spartansburg, Pennsylvania, unless mutually agreed to do otherwise." In his report, the Hearing Officer explained that need for stability and continuity militated in favor of Father's proposed exchange location since the children were accustomed to being dropped off at the Spartansburg Methodist Church. The proximity of the parties' residence also favored [F]ather's request given that [M]other relocated to Titusville in Crawford County, while [F]ather lived and worked in Erie County. As another relevant factor, the Hearing Officer noted that "[F]ather's commute home from work is 45 minutes" and that "[r]equiring [F]ather to then drive to Titusville after work would be a safety risk for the children." In the end, the Hearing Officer concluded:

> The children are accustomed to custody exchanges at the church. Although, the church is farther from [M]other's home, the safety of the children is of paramount concern. [M]other's proposal would require [F]ather to leave home early in the morning, drive to work in Erie and then return home only to drive to Titusville.

No exceptions were filed to the Hearing Officer's recommendations, and the Hearing Officer's recommended order was signed unaltered by [the custody trial jurist] on November 20, 2023[("the 2023 custody order")].

On January 19, 2024, [F]ather filed another Petition for Contempt against [M]other for her failure to exchange the children with him at the Spartansburg Methodist Church at 5:00 p.m. on December 22, 2023 and January 15, 2024. On both of those days the children were off from school, necessitating that [M]other provide transportation to the exchange location (as opposed to the children being dropped off at that location by the school bus). An Amended Petition for Contempt was filed on April 10, 2024, alleging that [M]other again failed to exchange the children consistent with the terms of the Custody Order on March 28, 2024.[1] [M]other filed an Answer and New Matter on April 12, 2024, alleging that [F]ather failed to act in good faith in not mutually agreeing to an alternate custody exchange on those occasions and arguing that [F]ather's conduct in filing

- 3 -

the contempt petitions was obdurate, vexatious, and done in bad faith….

> [1] There was testimony at the Contempt Hearing suggesting the date may have actually been March 29, 2024.

A hearing on [F]ather's Amended Petition for Contempt and [M]other's New Matter was held before the undersigned on April 16, 2024. At the conclusion of the hearing, the court found on the record that [F]ather's conduct was neither obdurate, vexatious, repetitive, nor done in bad faith. It further found [M]other in contempt of the November 2023 Custody Order, and ordered her to pay $850.00 in counsel fees to Father as a sanction for the contempt. An Order followed on April 23, 2024.

(Trial Court Opinion, filed 6/4/24, at 1-4) (record citations omitted). On May 20, 2024, Mother timely filed a notice of appeal and concise statement of matters complained of on appeal.

Mother now raises four issues for our review:

Whether the trial court committed an error of law and/or an abuse of discretion when it found that Mother violated the November 20, 2023, custody order willfully and with wrongful intent and as such found her to be in contempt and ordered sanctions.

Whether trial court committed an error of law and/or an abuse of discretion when it found beyond a reasonable doubt that Mother had the ability to comply with the custody order.

Whether the trial court committed an error of law when it found that the November 20, 2023 order was clear in its terms and then modified the order.

Whether the trial court committed an error of law and/or an abuse of discretion when denied Mother's new matter.

(Mother's Brief at 5-6).

"In reviewing a trial court's finding on a contempt petition, we are limited to determining whether the trial court committed a clear abuse of discretion. This Court must place great reliance on the sound discretion of the trial [court] when reviewing an order of contempt." *Rogowski v. Kirven*, 291 A.3d 50, 57 (Pa.Super. 2023) (internal citation and quotation marks omitted).

Mother's first two issues are related, and we address them together. Mother does not dispute that she failed to produce Children for the custody exchanges on the dates alleged in Father's contempt petition. Mother insists, however, that she did not possess the wrongful intent necessary to support a finding of civil contempt. Mother emphasizes that she submitted evidence to confirm that she was at work on the dates at issue, and Father did not object to any of her evidence or offer testimony to the contrary. Mother maintains: "To find that Mother acted wrongfully simply by going to work, particularly in this case, as a nurse for a scheduled twelve-hour shift, is contrary to common sense." (Mother's Brief at 16).

Citing the court's comments from the contempt hearing, Mother also posits that the court "found Mother had proven her affirmative defense of an inability to comply" with the 2023 custody order. (*Id.* at 17) (citing N.T. Contempt Hearing, 4/16/24, at 25). Mother contends that the court then shifted the evidentiary burden back to Father to prove, beyond a reasonable doubt, that Mother had the ability to comply with the terms of the order.

Mother asserts that Father "woefully failed to meet this burden." (*Id.* at 18). Nevertheless, Mother complains that the court "then shifted the burden of proof back on Mother to prove that she had no alternatives available to her on these occasions for the custody exchanges." (*Id.* at 19).

At the conclusion of the contempt hearing, the court found that Mother had not exhausted all options to comply with the 2023 custody order. In response, Mother argues that the court effectively relieved Father of his burden of proof. Additionally, Mother advances that the court

> made contradictory findings that Mother both established her affirmative defense of an inability to comply with the order … and then simultaneously found that Mother had the ability to comply with the order because she failed to exhaust all alternatives to comply with the order.

(*Id.* at 21). Based upon the foregoing, Mother concludes that Father failed to prove that Mother acted with wrongful intent, and the court erred in finding that Mother had the ability to comply with the 2023 custody order. We disagree.

"To be in contempt, a party must have violated a court order, and the complaining party must satisfy that burden by a preponderance of the evidence." **Rogowski, supra** at 57 (quoting **J.M. v. K.W.**, 164 A.3d 1260, 1264 (Pa.Super. 2017)).

> Specifically, the complainant must prove certain distinct elements: (1) that the contemnor had notice of the specific order or decree which he[, or she,] is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent.

*Id.* (quoting *J.M., supra* at 1264).

> [W]hen making a determination regarding whether a defendant acted with wrongful intent, the court should use common sense and consider context, and wrongful intent can be imputed to a defendant by virtue of the substantial certainty that his [or her] actions will violate the court order.

*Gross v. Mintz*, 284 A.3d 479, 492-93 (Pa.Super. 2022), *appeal denied*, ___ Pa. ___, 293 A.3d 563 (2023) (quoting *Commonwealth v. Reese*, 156 A.3d 1250, 1258 (Pa.Super. 2017)).

"[A] mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt." *Habjan v. Habjan*, 73 A.3d 630, 637 (Pa.Super. 2013) (quoting *Lachat v. Hinchcliffe*, 769 A.2d 481, 488 (Pa.Super. 2001)).

> If the alleged contemnor is unable to perform and has, in good faith, attempted to comply with the court order, then contempt is not proven. The contemnor has the burden to prove the affirmative defense that he [or she] lacks the ability to comply. The defense of impossibility of performance is available to a party in a contempt proceeding if the impossibility to perform is not due to the actions of that party.

*Thomas v. Thomas*, 194 A.3d 220, 226 (Pa.Super. 2018) (internal citations and quotation marks omitted). "To impose civil contempt the trial court must be convinced beyond a reasonable doubt from the totality of evidence presented that the contemnor has the present ability to comply with the order." *In re Estate of DiSabato*, 165 A.3d 987, 992-93 (Pa.Super. 2017) (quoting *Sinaiko v. Sinaiko*, 664 A.2d 1005, 1009 (Pa.Super. 1995)).

Instantly, the court expressly determined that Mother had the ability to comply with the 2023 custody order:

> First o[f] all, the court did not find that the children's grandmother was completely unavailable, as [M]other suggested. No doubt, the grandmother has expressed her desire to not be involved in the custody exchange on a regular basis…. And [M]other offered a valid justification for the grandmother not wanting to be involved on a continuing basis, namely that she cares for her husband, who is a disabled veteran, and because she takes turns with her sisters caring for the children's 93 year-old great grandmother. But this does not mean that the grandmother is totally unavailable as a backup to transport the children on occasions when the children are off from school and [M]other is working. [M]other insisted that the grandmother [is] "not willing to drive. She doesn't want any part of the driving[,]" yet [F]ather persuasively pointed out during cross-examination that the grandmother continues to occasionally transport the children to family events, as she did for a recent Easter egg hunt. Secondly, [M]other failed to persuade the court that she had exhausted all realistic and reasonable alternatives for ensuring the children are transported to the church drop-off location on time on days the children are not in school, including the availability of other family members or trusted friends, or the [feasibility] of hiring a babysitter or other paid help to transport the children when their grandmother or [M]other's boyfriend is unable to do so.

(Trial Court Opinion at 7-8) (record citations omitted).

The court also determined that Mother violated the order with wrongful intent:

> [U]nder the wrongful intent element, [M]other knew, or reasonably should have known, that her conduct was wrong. When viewed in the historical context of this case, that becomes apparent. [M]other was before the undersigned on a contempt petition relating to the exchanges in early 2022; later that year the subject was again litigated before Judge Walsh. The parties attempted to mediate the dispute

without success and eventually returned in front of the hearing officer, who was convened solely to resolve the exchange issue. Unlike the petition brought under the Temporary Order, [M]other could not claim that this provision, requiring her to transport the children to the Spartansburg Methodist Church at 5:00 p.m., was ambiguous, so she could not argue that she in any away misinterpreted or misunderstood the Custody Order. Nor does the court find that she made a sufficiently good faith attempt at compliance, for the reasons already discussed. She simply defied what she perceived to be an unjust requirement. That was patently wrongful.

(*Id.* at 9). Our review of the contempt hearing transcript supports the court's conclusions.

Regarding Mother's purported defense, her cross-examination testimony is dispositive. Initially, Mother claimed that Maternal Grandmother is "not willing to" pick up Children at the church if Mother is at work during a custody exchange period. (N.T. Contempt Hearing at 35). Mother immediately conceded, however, that her "significant other has been at times available to do that." (*Id.*) Later, Mother qualified this testimony by stating that her boyfriend is a doctor who "can't leave the hospital at times. He's not a dependable driver." (*Id.* at 37). Mother then testified that Children were with Maternal Grandmother on the dates when Mother was at work during custody exchange periods. Mother also explained that Maternal Grandmother is a caregiver for other family members, and Mother "cannot force [Maternal Grandmother] to drive." (*Id.* at 37). Thereafter, the following exchange occurred:

[COUNSEL:] [Maternal Grandmother's] willing to drive to

> activities with the kids during your custody time if she's watching them?
>
> [Mother:]    She went to an Easter egg hunt at her mother's house with the family.

(*Id.* at 38).  This testimony confirmed the court's assertion that Maternal Grandmother was not completely unwilling to drive Children on Mother's behalf.  On this record, we cannot say that the court abused its discretion in concluding that Mother failed to prove her inability to comply with the 2023 custody order.  *See Rogowski, supra*; *Thomas, supra*.

Regarding Mother's wrongful intent, Mother admitted that she was scheduled to work on each of the dates for the custody exchanges at issue. (*See* N.T. Contempt Hearing at 26).  Mother also testified that she texted Father in advance about her work schedule, but the parties did not reach an agreement on an alternative solution for transporting Children to the exchanges.  (*See id.* at 29-32).  This record left no doubt that wrongful intent could be imputed to Mother.  *See Gross, supra*.

To the extent Mother complains that the court made a contradictory finding that Mother established the affirmative defense of impossibility, the record does not support this claim.  As the court noted in its opinion, it found that Mother "put forward sufficient threshold evidence **to raise** the affirmative defense of impossibility."  (Trial Court Opinion at 6) (emphasis added).  Nevertheless, based upon the aforementioned reasoning, "the court did not credit [M]other's claim of impossibility."  (*Id.* at 8).  The court also provided

the following analysis of the relevant burdens of proof:

> [T]he case law describes impossibility as an affirmative defense to be proven by the contemnor, yet also instructs that the trial court must be convinced beyond a reasonable doubt that the contemnor has the present ability to comply with the order. While the case law does not specify who bears the burden of production to demonstrate that the alleged contemnor has the ability to comply, it would naturally fall on the opposing party to put forward such evidence. Thus, at the contempt hearing, the court assumed [M]other had an initial burden to demonstrate impossibility…. Finding that she had satisfied this initial burden, the court then proceeded to consider whether it was convinced beyond a reasonable doubt, based upon the totality of the evidence presented [by] both parties, that [M]other had the ability to comply with the Custody Order.

(*Id.* at 6-7 n.2) (internal citations omitted). Our review of the relevant cases reveals that the court did not commit any legal error in evaluating the evidence offered at the hearing. *See Thomas, supra*; *Estate of DiSabato, supra*. Based upon the foregoing, we conclude that Mother is not entitled to relief on her first two claims.

In her third issue, Mother contends that the trial court found the terms of the 2023 custody order were clear. Mother complains, however, that the court recognized that the 2023 custody order was not as clear as it should have been, and the court subsequently entered an amended custody order providing that "the parents shall be responsible for ensuring that the children are exchanged at … the appropriate exchange time, unless mutually agreed otherwise." (Mother's Brief at 24) (quoting Order, entered 4/23/24). "In so making this amendment to the custody order, the trial court bootstrapped its

finding that Mother was in contempt." (*Id.*) Because the court ultimately needed to issue an amended order, Mother concludes that the court committed an error of law in finding that the terms of the 2023 custody order were clear. We disagree.

"To be punished for contempt, a party must not only have violated a clear order, but that order must have been **definite, clear, and specific**— leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct." *Sutch v. Roxborough Memorial Hosp.*, 142 A.3d 38, 67 (Pa.Super. 2016), *appeal denied*, 640 Pa. 378, 163 A.3d 399 (2016) (emphasis in original) (quoting *Stahl v. Redcay*, 897 A.2d 478, 489 (Pa.Super. 2006), *appeal denied*, 591 Pa. 704, 918 A.2d 747 (2007)). "Because the order forming the basis for civil contempt must be strictly construed, any ambiguities or omissions in the order must be construed in favor of the defendant." *Id.* (quoting *Stahl, supra* at 489)

Instantly, the 2023 custody order provided for custody exchanges as follows: "Transportation for exchanges shall be as follows: The parents shall exchange physical custody of the children at the Methodist Church in Spartansburg, Pennsylvania, unless mutually agreed to do otherwise." (Order, filed 11/21/23, at ¶4(b)). In evaluating the terms of this order, the trial court specifically addressed Mother's argument as follows:

> As best we can tell, [M]other contends that, in modifying Paragraph 4(b), the court implicitly admitted the Custody Order was not clear in its terms, despite its finding to the contrary. But this argument is premised upon a false

- 12 -

dichotomy. Just because the language of Paragraph 4(b) **could** have been drafted more clearly does not mean that the language is not sufficiently clear to support the charge of contempt.

\* \* \*

Here, there was no doubt or uncertainty regarding [M]other's obligation to ensure that the children be exchanged at the Spartansburg Methodist Church at 5:00 p.m. Any ambiguity concerned whether [M]other was required to personally transport the children, or whether she could ensure compliance through third parties. [M]other appears to have interpreted the provision to allow for exchanges to occur through third parties,[5] and the court did not hold her to a stricter interpretation that would have required she personally transport the children herself. In any event, the Custody Order was unambiguously clear in the term that the children were to be exchanged at the Spartansburg Methodist Church at a particular time. It is this command with which [M]other did not comply.

[5] As already discussed, [M]other stressed that the grandmother was completely unavailable to transport the children on days they were not in school, a claim we found to be incredible. If she had been under the impression that she was required to personally transport the children for every exchange, this point would have had little relevance.

(Trial Court Opinion at 10-11) (emphasis in original). We agree that the relevant provision within the 2023 custody order was definite, clear, and specific, such that Mother could have no doubt or uncertainty as to the prohibited conduct. **See Sutch, supra**. Therefore, Mother is not entitled to relief on her third claim.

In her fourth issue, Mother reiterates the argument from the new matter she filed on April 12, 2024. Mother claims that she gave Father advance notice

- 13 -

of her inability to transport Children to the three custody exchanges at issue.

Mother complains that Father absolutely refused to work with her to make

alternate arrangements, which left Mother "in the position of having to choose

between going to work or complying with [the 2023 custody] order."

(Mother's Brief at 26).

> While Mother acknowledges that Father has no legal obligation to accommodate her work schedule and make alternate arrangements for the exchanges, his then coming into court on the basis that Mother violated the court order when good faith attempts were made by Mother, in advance, to avoid violation of the order, is obdurate, vexatious and in bad faith.

(*Id.* at 26-27). On this basis, Mother concludes that the court should have

granted relief on her new matter by awarding her counsel fees. We disagree.

"Our standard of review of an award of counsel fees is well settled: we

will not disturb a trial court's determination absent an abuse of discretion."

*A.L.-S. v. B.S.*, 117 A.3d 352, 361 (Pa.Super. 2015). The Domestic Relations

Code provides for an award of counsel fees under the following circumstances:

### § 5339. Award of counsel fees, costs and expenses

> Under this chapter, a court may award reasonable interim or final counsel fees, costs and expenses to a party if the court finds that the conduct of another party was obdurate, vexatious, repetitive or in bad faith. This section may not apply if that party engaged the judicial process in good faith to protect the child from harm.

23 Pa.C.S.A. § 5339.

"Obdurate" means "stubbornly persistent in wrongdoing." *Moyer v.*

*Leone*, 260 A.3d 245, 252 n.6 (Pa.Super. 2021). "A suit is vexatious, such

as would support an award of counsel fees, if it is brought without legal or factual grounds and if the action served the sole purpose of causing annoyance." ***Dong Yuan Chen v. Saidi***, 100 A.3d 587, 592 (Pa.Super. 2014). "Behavior that protracts litigation may nonetheless not rise to the level of obdurate, vexatious and dilatory conduct within the meaning of the statute." ***Id.*** Further, an individual can be charged with filing a lawsuit in "bad faith" if he filed the suit for purposes of fraud, dishonesty, or corruption. ***See Moyer, supra*** at 255.

Instantly, the trial court evaluated Father's legal filings, and it found that Father's actions did not warrant an award of counsel fees to Mother:

> [F]ather's conduct was not stubbornly persistent in wronging, and therefore not obdurate, because there is nothing "wrong" about bringing non-frivolous (and here meritorious) claims of contempt against another party. The conduct was not vexatious because there were sufficient legal grounds for bringing a contempt petition where one party fails to comply with a custody order; there were sufficient factual grounds to do so based upon [M]other's failure to exchange the children in accordance with the terms of the Custody Order; and the court found that the petitions were not brought for the sole purpose of causing annoyance, but rather, to encourage [M]other through positive punishment to comply with the Custody Order in the future. Additionally, [F]ather's petitions were not repetitive because they sought contempt for distinct violations of the Custody Order on different occasions.[6]
>
> > [6] In her New Matter, [M]other did not actually seek an award for counsel fees on this basis, but the court made the finding on the record that the conduct was not repetitive.
>
> The court also found that the petitions were not filed in bad faith because there was nothing fraudulent, dishonest, or

corrupt about them. [M]other argued that [F]ather acted in bad faith by refusing to make alternate accommodations with [M]other by "mutual agreement" as that term is defined in Paragraph 10 of the Custody Order. Paragraph 10 states, in relevant part, that "[t]his custody arrangement may be modified by an agreement of the parties when required for the best interest of the children. The term 'mutual agreement' contemplates good faith discussions by both parents to reach an agreement as to specific dates and times of partial custody or visitation[.]" The court has already noted its criticism of [F]ather on the record and arguably, [F]ather has not acted in good faith in his negotiations with [M]other to reach an amicable resolution for the sake of the children. But there is a gulf between conduct not done in good faith, and conduct committed in bad faith. That [F]ather has been somewhat selfish in his dealings with [M]other—at the expense of not only [M]other, but more importantly, the children—is not a solid basis, on its own, to find that he acted fraudulently, dishonestly, or corruptly in filing the contempt petitions or in negotiating with [M]other.

(Trial Court Opinion at 12-13) (record citations omitted). Based upon our review of the statute and relevant cases interpreting its language, we are satisfied with the court's reasoning in support of its denial of Mother's request for counsel fees. *See* 23 Pa.C.S.A. § 5339. *See also Moyer, supra*; *Dong Yuan Chen, supra*. Accordingly, Mother is not entitled to relief on her final issue, and we affirm the order granting Father's contempt petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/25/2024